No. 68,820

VIRGIL DELBERT REED, *Appellant*, v. KANSAS RACING
COMMISSION, *Appellee*.
(860 P.2d 684)

Opinion filed October 8, 1993.

*Stephen M. Joseph,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause and was on the brief for appellant.

*Karen C. Wittman,* assistant attorney general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is an administrative law case arising out of a conflict between the Kansas Racing Commission (KRC) and a racetrack manager.

Virgil Delbert Reed, former general manager of the Wichita Greyhound Park, appeals the district court's affirmance of an order entered by the KRC under the Parimutuél Racing Act, K.S.A. 74-8801 *et seq.* The order revoked his occupation license, fined him $6,000, and permanently excluded him from the park. Our jurisdiction is under K.S.A. 20-3018(c) (transfer from the Court of Appeals on motion of this court).

The Kansas Administrative Procedure Act (KAPA), K.S.A. 77-501 *et seq.,* and the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.,* furnish the procedural perimeters for our review.

The field of appellate inquiry considers issues presented by Reed concerning (1) the sufficiency of the notice of the charges against him; (2) the lack of substantial evidence supporting the KRC order; and (3) the validity of statutes and KRC regulations which were attacked as being unconstitutionally vague.

As more fully set out in the opinion, we affirm on the substantial evidence and vagueness issues and reverse on the sufficiency of the notice issue.

## Facts

Reed was employed by Wichita Greyhound Park, Inc., a for-profit corporation which is the "facility owner licensee" for the

park. See K.S.A. 74-8802(3). He was issued an occupation license by the KRC in March 1990, in connection with his employment. State racing judges officiating at the racetrack conducted an emergency misconduct hearing under K.S.A. 74-8816(h) in September 1990 and suspended Reed's license. The KRC, following the emergency hearing, issued a notice of formal hearing which contained a list of alleged violations.

The notice of hearing was orally amended at a prehearing conference. The KRC chairman, who was presiding at the conference, ordered that Reed be furnished with the specific allegations of perjury by October 2 (eight days prior to the KRC hearing). The chairman also ordered:

"The administrative hearing in this case is *limited to the allegations* as set forth in the request for hearing and notice of formal hearing as orally amended in this prehearing conference *unless* amended or joined by order of the presiding officer after written motion filed by petitioner's counsel [the KRC's attorney] *and an opportunity to respond* is afforded to respondent." (Emphasis added.)

An amended hearing notice incorporating 11 specific perjury charges was issued. There were no further amendments to the charges against Reed.

The content of the five counts in the amended hearing request overlapped. The charges, according to their topical substance, are: (1) the telefax charge; (2) the perjury charge; (3) the "unqualified" to be general manager charge; (4) the loan to make a bet charge. The fifth count was a request to bar Reed from the Park.

The KRC conducted a four-day formal administrative hearing. Reed was found to have committed violations in three of the four charges (no violation was found on the loan charge). Summarized, the KRC's order was as follows:

| Count | Violation | Penalty |
|---|---|---|
| COUNT I | K.A.R. 112-11-21(a) (1991 Supp.), receiving gambling information; K.S.A. 21-3805 giving false testimony under oath | license revoked; fined $5,000 |

| COUNT II | K.A.R. 112-11-21(j) and (k) (1991 Supp.), receiving gambling information | license revoked; fined $500 |
|---|---|---|
| COUNT III | K.S.A. 74-8816(b), occupation license; K.S.A. 74-8816(e)(3), (5), unqualified to perform duties of his license | license revoked; fined $500 |
| COUNT IV | K.S.A. 74-8819(f), loaning money to wager | no violation |
| COUNT V | based on violations stated in counts I-III | K.S.A. 74-8804(f)(1), (3); excluded from racetrack facilities in Kansas |

Reed, in a petition for reconsideration, sought rescission of the fines and modification to reflect that he was guilty only of negligence. The order was modified as to Count III in accordance with Reed's request on a charge referred to as the Coleman Washington incident.

## The Telefax Charge

In August 1990, a two-page message for Rudy Williams, a professional gambler and a regular customer at the Park, was received on the Park's telefax machine. The fax contained information to be used by Williams in placing bets that day at the Park. As a result of the interaction between Reed and Williams in connection with the fax, Reed was charged with violating KRC regulation K.A.R. 112-11-21(a) (1991 Supp.) (Count I) (prohibiting violation of federal, state, or local laws by any person while on the grounds of a racetrack facility). Reed was so charged because of allegations he violated K.S.A. 21-3805 (perjury) and 18 U.S.C. § 1084(a) (1988) (prohibiting the use of wire communication to transmit information assisting in the placing of bets or wagers at a sporting event or contest while on park grounds). The KRC alleged that 18 U.S.C. § 1084(a) was violated through Reed's

"acquiescing in and permitting the use of the racetrack's telefax machine to receive gambling information."

This same telefax acquiescence formed the basis for Count II, which alleged that Reed violated K.A.R. 112-11-21(j) (1991 Supp.) ("When on the grounds of a racetrack facility, no person shall: . . . [j] unless authorized by the stewards or racing judges, use any radio transmitter or other transmitting device at a race-track facility during a race meet.") and K.A.R. 112-11-21(k) (1991 Supp.) ("When on the grounds of a racetrack facility, no person shall: . . . (k) unless authorized by the commission, transmit or receive or attempt to transmit or receive wagering information through the use of a communication device.").

The KRC found clear and convincing evidence that Reed had permitted gambling information to be received on the telefax machine.

Reed contends that he did not (1) see gambling information on the fax sheet; (2) give permission to Williams to use the telefax machine; and (3) know the machine had been used until after the fact.

The trial judge reviewed the evidence and found, among other things, that Reed (1) attempted to locate the fax for Williams; (2) was present when an office employee handed the fax to Williams; and (3) saw the top page of the fax, which contained twin-tri and pick-six wagering information.

Reed emphasizes that the KRC did not find that he had authorized use of the Park's telefax machine, nor did it find that he had given Williams permission to receive the information on the Park's machine. Reed asserts that all the KRC found was that he was aware, after the fact, that gambling information for Williams was received on a telefax machine.

## Perjury

The giving false information under oath charge related to perjury allegedly committed at the emergency hearing. Count I set out 11 specific incidents of perjury, all relating to the Reed-Williams relationship at the Park after the fax arrived. A specific page of the hearing transcript was referenced for each incident. Count I also stated: "In addition to the foregoing separately numbered areas of false testimony, special counsel [for the KRC]

hereby incorporates by reference each and every variance between the statements given by Virgil Delbert Reed under oath at the September 8 and 9, 1990, emergency hearing."

The KRC found that Reed, in four situations, willfully and knowingly gave false testimony under oath: *i.e.,* (a) Reed's denial of any knowledge or information that gambling information was being received on a telefax machine at Wichita Greyhound Park on August 31, 1990; (b) Reed's description of the events in connection with his meeting Rudy Williams on August 31, 1990; (c) Reed's role in writing the Idaho racing regulations; and (d) Reed's participation on an Iowa senate committee on parimutuel rules.

## The "Unqualified" to be General Manager Charge

An occupation license may be denied, suspended, or revoked if an applicant "is not qualified to perform the duties associated with the license being applied for." K.S.A. 74-8816(e)(3) and (f).

Count III alleged that Reed intentionally disregarded and displayed a predilection to disregard, at his pleasure, certain KRC regulations: (1) K.A.R. 112-11-7 (1991 Supp.) provides that track security personnel must cooperate with law enforcement agencies having jurisdiction to enforce criminal laws and regulations at racetrack facilities. Reed disciplined Dan Hall, a former assistant director of security, for answering a question from counsel for the KRC in the presence of various KRC officials (including Ben Travis, the Director of Racing). The question related to defective heat alarms. (2) Reed also disciplined Hall because one of Hall's subordinates attempted to enforce the provisions of K.A.R. 112-11-10 (1991 Supp.) (relating to state license and visitors' passes) with respect to Coleman Washington (Director of Housekeeping). Reed took the position with senior security staff that his personal will and desires had precedence over the Kansas law and regulations requiring occupation licensing. Reed stated that Coleman Washington should be permitted to work without an occupation license, in violation of K.S.A. 74-8816(b), and that security personnel should not question Reed's wishes or embarrass management personnel by attempting to enforce the law. In connection with Hall's response to KRC counsel's questions relating to defective alarms, Reed charged Hall with disloyalty to the track

management and with failure to act like a team player. Reed discharged Hall in August of 1990.

Reed disputes the contention that he took disciplinary action against Hall as a result of either incident. Reed's testimony indicates that he believed he had sent Hall a "counseling statement" and had not "disciplined" Hall.

The KRC found, under Count III, that Reed was unqualified to perform the duties associated with his position as general manager.

The trial court affirmed the KRC on Count III. In reviewing the Coleman Washington incident, the court stated:

"Shortly before noon on June 27, 1990, Mr. Washington arrived at the commission licensing office with Mr. Reed. Mr. Reed stated that security had failed to offer Mr. Washington a visitor's pass, but a commission license clerk had been informed to the contrary by a security officer, and she explained to Mr. Washington that the security officers were just doing their jobs. Mr. Reed interjected 'the hell with security.' The clerk stated security was merely enforcing the regulations established by the state legislature, but Mr. Reed stated that 'legislators make rules because they have nothing better to do.' "

"On July 3, 1990, six days after the Coleman Washington incident, the general manager summoned Security Director Jack Henderson and Assistant Security Director Dan Hall to his office and verbally chastised them for filing a state report of violation regarding the June 27, 1990 Coleman Washington incident. Mr. Reed referenced a report of violation prepared by security officer Randal Smith, and said he would not have his friend Mr. Washington or other department heads treated in such a manner. Mr. Reed further stated 'he did not care about the dogshit rules of Kansas, this was his track, and he was going to do things his way.' "

In reviewing the Ben Travis incident, the court stated:

"At a July 3, 1990 meeting in Mr. Reed's office, the general manager verbally reprimanded Assistant Security Director Dan Hall for three complaints made by the track's director of bars and concessions concerning three incidents that allegedly occurred in June. Mr. Hall testified that the cited incidents did not occur and that he had attempted to explain to Mr. Reed that they never occurred, but the general manager cut Mr. Hall off. Later the same day Mr. Reed issued written reprimands to Mr. Hall in connection with the three complaints and a fourth complaint, which charged Mr. Hall with inappropriately providing information on defective heat alarms to representatives of the Kansas racing commission on June 20, 1990.

"Three employees mentioned in the complaints written by the director of bars and concessions testified that the complaints were inaccurate, and the reported incidents did not occur, or did not occur in a way so as to reflect

poorly on Mr. Hall. Although Mr. Hall filed written responses to all of the written complaints and write-ups, and requested a hearing with Mr. Reed, the director of bars and concessions, and the employees mentioned in the written complaints, Mr. Reed refused to grant such a hearing and the reprimands stood as issued."

## The Request to Bar Reed from the Park

Count V, which contained no additional substantive allegations, requested that Reed be excluded from Kansas racing facilities under K.S.A. 74-8804(f)(1) and (3). Reed was charged with having "violated provisions of the Pari-Mutuel Racing Act, and the rules and regulations of the Racing Commission, and as a person whose presence reflects adversely on the honesty and integrity of greyhound racing." The KRC, by a three to two vote, determined that Reed's "presence in the future at Wichita Greyhound Park could raise questions as to allegations of impropriety and be extremely disruptive to employees who might have been working at the racetrack while the respondent was general manager."

## The Standard of Review

Our standard of review is statutorily defined by the KJRA, K.S.A. 77-601 *et seq.*

K.S.A. 77-623 provides that agency actions are reviewable by appellate courts as in other civil cases.

K.S.A. 77-621(c) states:

"The court [the district court in the case at bar] shall grant relief only if it determines any one or more of the following:

(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

. . . .

(4) the agency has erroneously interpreted or applied the law;

.(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

. . . .

(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole . . . ; or

(8) the agency action is otherwise unreasonable, arbitrary or capricious."

We exercise the same review of the agency's action as does the district court. *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 455-56, 807 P.2d 652 (1991). We must accept as true the evidence and all inferences to be

drawn therefrom which support or tend to support the findings of the trial court. We are to disregard any conflicting evidence or other inferences which might be drawn therefrom. *Vakas v. Kansas Bd. of Healing Arts,* 248 Kan. 589, 604, 808 P.2d 1355 (1991). "A rebuttable presumption of validity attaches to all actions of an administrative agency and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's action. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n,* 244 Kan. 343, 344, Syl. ¶¶ 8, 9, 770 P.2d 423 (1989)." *Kaufman v. Kansas Dept. of SRS,* 248 Kan. 951, 961, 811 P.2d 876 (1991).

We extend deference to an agency's interpretation of its own regulations. The interpretation will not be disturbed on appeal unless it is clearly erroneous or inconsistent with the regulation. *In re Tax Appeal of Newton Country Club Co.,* 12 Kan. App. 2d 638, 647, 753 P.2d 304, *rev. denied* 243 Kan. 779 (1988). The extension of deference, however, does not mean that we abdicate our responsibility of judicial oversight in the review of agency actions.

## Notice of the Allegations of Misconduct

Reed argues that when the KRC found him unqualified to be general manager, it did so based on conduct which was not charged in the amended hearing notice.

Reed also contends that the KRC found him guilty of conduct not specified in the amended hearing notice in connection with the perjury charge. According to Reed, the four instances in which the KRC found him guilty of perjury were not among the initial 11 specified in the hearing notice. Reed reasons that to convict him of perjury, the KRC had to concoct four other charges that he did not know about until he read the KRC's final order. Additionally, he emphasizes that the prehearing conference order contained a precise requirement for notice of the charges, as well as a limitation on the issues to be heard by the KRC. Reed observes that no further amendments to the charges against him were presented prior to the KRC hearing. We consider the chairman's prehearing conference order limiting the issues to be heard of significance in resolving the perjury notice issue.

The absence of sufficient notice is important because K.S.A. 74-8816(f) expressly provides that proceedings to revoke an occupation license or impose a fine shall be conducted in accordance with the KAPA. Notice and a hearing are required before the KRC can revoke a license. K.S.A. 77-512. The notice must contain "a statement of the issues involved and, to the extent known to the presiding officer, of the matters asserted by the parties." K.S.A. 77-518(c)(7). Reed also contends that the lack of notice violated his constitutional right to procedural due process under the Fourteenth Amendment.

The KRC, in response to Reed's due process claim, emphasizes its regulation K.A.R. 112-4-6 (1991 Supp.).

"**License subject to conditions and agreements.** (a) Each license issued to a licensee by the commission shall remain the property of the commission.

"(b) Possession of a license shall not confer any right upon the holder to employment at a racetrack facility."

Consequently, the KRC has explicitly stated that an occupation license, which is required before an individual can work at a racetrack facility (K.S.A. 74-8816 and K.A.R. 112-4-1 [1991 Supp.]), does not confer a property right in the license or in a position at a racetrack. According to the KRC, an individual must have some type of protected property interest before substantive due process is implicated. See *Kosik v. Cloud County Community College*, 250 Kan. 507, 512, 827 P.2d 59, *cert. denied* 121 L.Ed. 2d 138 (1992), and *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 353-58, 770 P.2d 423 (1989). We need not reach Reed's Fourteenth Amendment contention because we conclude that the notice Reed received was facially inadequate in certain respects when compared with the violations found by the KRC.

Reed emphasizes that the trial court erred when it found that the perjured matters were stated "to the extent known." According to Reed, the trial court's reasoning creates a "Kafka-like" dilemma: Despite the notice requirements of the prehearing conference order limiting the charges, he "should have been prepared to defend himself on all possible charges of perjury arising from the emergency hearing and all possible charges that he was not qualified . . . as long as those unknown charges were 'sim-

ilar' to those actually alleged." Reed insists that he did not even know during the hearing what he was charged with.

The KRC counters with a discussion of the notice issue as it relates to the finding that Reed was unqualified to be general manager. The KRC indicates that it not only adopted specific findings concerning the Travis and Washington incidents, but it also adopted findings concerning other violations. Consequently, the KRC maintains that Count III (Reed's qualifications to remain as general manager) was supported by findings concerning the Travis and Washington incidents, for which Reed had notice. We agree.

Additionally, the KRC indicates that "[u]nder Kansas law it is 'reasonable' notice that is required," citing *Rydd v. State Board of Health*, 202 Kan. 721, 451 P.2d 239 (1969). The KRC reasons that Reed was put on notice that his qualifications for licensure were at issue due to his flagrant disregard for the racing act. The KRC contends that, in addition to the 11 referenced instances of perjury, it alleged generally that Reed committed perjury as to other facts. The other facts were testified to at the emergency hearing and were incorporated by reference in the prehearing conference order. The KRC argues that the additional facts were examples consistent with Reed's intentional disregard for racing rules. According to the KRC, Reed had actual notice that testimony concerning disregard for rules would be elicited from Park employees, and the KRC fully complied with KAPA notice requirements. We do not agree.

In *Community of Woodson v. State Corporation Comm.*, 186 Kan. 747, Syl. ¶ 1, 353 P.2d 206 (1960), we reasoned that a statement with reasonable and substantial certainty is required so as to advise a respondent of the matters charged and the relief sought. The key consideration for determining the sufficiency of the notice received by Reed is whether he was sufficiently forewarned so as to allow him to adequately prepare his defense.

We are troubled by the fact that Reed was found, in certain instances, to be guilty of actions other than those for which he was charged. The prehearing conference order specifically limited the hearing to allegations set forth in the amended charging document. Reed could have relied upon this notice and only prepared to defend the particular 11 instances of perjury which were spec-

ified prior to the hearing. The specificity of the perjury charges, coupled with the order requiring the hearing to be on stated allegations, created a situation where Reed lacked notice as to two of the KRC's perjury findings, *i.e.*, his relationship with (1) the Idaho racing regulations and (2) the Iowa senate committee.

We affirm the KRC's perjury findings on Reed's denial of knowledge that gambling information was received on the telefax machine and his description of the events in connection with his meeting Rudy Williams on August 31, 1990. We reverse as to the remaining two findings (Reed's role in writing the Idaho racing regulations and his participation on an Iowa senate committee on parimutuel rules).

### Transmitting or Receiving Wagering Information Through the Use of a Communication Device

Reed asserts that he was charged with "permitting" one or all of the types of conduct proscribed by certain statutes and KRC regulations and that the evidence failed to prove even this conduct. He emphasizes that at most, he could be charged with after-the-fact knowledge that a fax message containing gambling information for Williams was received on the Park's telefax machine. According to Reed, it is not disputed that the first opportunity he had to know the contents of the fax message developed after the fax had been received on the Park's machine. Reed argues that even if he knew the fax contained gambling information he is not guilty of "receiving" gambling information.

Reed states that, as a matter of law, there is no evidence that he "permitted" the telefax machine to be used to receive gambling information. Reed asserts that foreknowledge and consent are necessary ingredients to permitting someone to do something. He argues that after-the-fact knowledge does not satisfy the definition of the term "permit." He relies on *Reeb v. Liquor Control Board*, 24 Wash. App. 349, 353, 600 P.2d 578 (1979) (To "permit" a regulatory violation to occur requires "actual or constructive knowledge of the circumstances which would foreseeably lead to the prohibited activity.").

Reed further believes that the KRC's true complaint was that he did not prevent Williams from taking the fax sheets and using the information to make bets. He observes that the KRC should

adopt a regulation commanding employees to prevent the use of gambling information received on a telefax machine if it wishes to ban such conduct. He reasons that the KCR is torturing the term "permit" to include knowledge acquired after the fact.

The KRC maintains that it assessed the credibility of the witnesses and, in the case of the conflicting testimony of Reed and Williams, found Williams to be credible. The KRC emphasizes that credible witnesses testified Reed not only was aware gambling information was received on the telefax machine, but that he also helped search for the fax and facilitated its delivery to Williams. The KRC maintains that Reed failed to take action to prevent the delivery of faxed information to a known gambler. It asserts that given Reed's experience and knowledge of the laws which prohibit the use of Park telefax machines in connection with gambling information, he should have made an inquiry as to the content of the fax before it was delivered to Williams.

The KRC does not directly respond to Reed's arguments on the issues concerning the distinction between actually transmitting or receiving information and permitting the information to be communicated. Reed raises valid questions concerning his conduct and the language of the regulations under which he was charged.

In the context of the federal statute and KRC regulations (18 U.S.C. § 1084[a] and K.A.R. 112-11-21[a], [j], and [k] [1991 Supp.]), the general nature of the regulations in question must be considered. Such an analysis leads to the conclusion that Congress and the KRC arguably intended to prohibit the use of fax technology in connection with the transmission of gambling information. The question before us in reviewing the fax incident is whether the record in the case at bar supports the KRC's conclusion that Reed violated K.A.R. 112-11-21(a) (1991 Supp.) as effected by a violation of 18 U.S.C. § 1084(a) ("knowingly uses a wire communication facility") and K.A.R. 112-11-21(j) and (k) (1991 Supp.). We think not. We do not evaluate credibility. We accept the KRC's version of the facts. The KRC does not allege that Reed himself used a transmitting device or received wagering information through the use of a communication device. Rather, the charge was that Reed permitted the Park's telefax machine to be used to receive the two-page fax message sent to Williams.

The regulations in question are not ambiguous. K.A.R. 112-11-21(j) (1991 Supp.) states: "When on the grounds of a racetrack facility, no person shall . . . (j) unless authorized by the stewards or racing judges, use any radio transmitter of other transmitting device at a racetrack facility during a race meet."

K.A.R. 112-11-21(k) (1991 Supp.) states: "When on the grounds of a racetrack facility, no person shall: . . . (k) unless authorized by the commission, transmit or receive or attempt to transmit or receive wagering information through the use of a communication device." The enforceable scope of the regulations should be limited to the plain language. "Permitting" the use of the Park's telefax machine is not within the scope of the proscribed activities.

18 U.S.C. § 1084(a) provides:

"Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both."

As a matter of law, the KRC and the trial court incorrectly applied the regulations in question to the factual scenario in the case at bar. Reed's conduct was not a violation of either K.A.R. 112-11-21(a) (1991 Supp.) as effected by 18 U.S.C. § 1084(a) or K.A.R. 112-11-21(j) and (k) (1991 Supp.).

## Not Qualified To Be General Manager—K.S.A. 74-8816(e)
### Not Unconstitutionally Vague

K.S.A. 74-8816(e)(3) provides:

"Denial of an occupation license by the commission shall be in accordance with the Kansas administrative review procedure act. The commission may refuse to issue an occupation license to any person who:

. . . .

"(3) is not qualified to perform the duties associated with the license being applied for."

Reed submits that it is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. He quotes *Watkins v. Roach Cadillac, Inc.*, 7 Kan. App. 2d 8, Syl. ¶ 5, 637 P.2d 458 (1981), *rev. denied* 230

Kan. 819 (1982). The Court of Appeals reasoned that "[c]onstitutionally impermissible vagueness in a statute depends on whether [persons] of common intelligence must guess at a statute's meaning and differ as to its application; if so, the statute lacks the first essential of due process and is void for vagueness."

Reed asserts that K.S.A. 74-8816(e)(3) neither conveyed fair warning to him that his conduct would render him "not qualified" to be the Park's general manager nor adequately guarded against arbitrary and discriminatory enforcement. Consequently, he reasons the statute is void for vagueness as applied to his conduct.

Reed notes that the KRC regulations provide for the possibility of examinations to "determine 'qualifications' for an occupation license" (K.A.R. 112-4-8 [1991 Supp.]), but fail to establish any other standards to define the term "qualified." He contends that there are no objective guidelines or standards in the KRC's regulations for assessing his qualifications to be the Park's general manager. He asserts that the absence of such guidelines means the KRC can be as arbitrary and discriminatory as it chooses. Consequently, Reed suggests that all one can do is judge the KRC's findings in light of the commonly understood meaning of "qualification." He maintains that none of the grounds used by the KRC constitute a "qualification" in the ordinary sense of that word as used by persons of ordinary intelligence.

Reed observes that even though a general manager's performance may be acceptable to his employer, the KRC reserves the right to suspend the license of the manager if it is not satisfied with the performance of duties, as opposed to qualifications to perform those duties. Reed argues that if the Kansas Legislature intended the phrase "not qualified to perform" in K.S.A. 74-8816(e)(3) to include actual performance of one's duties as well as the qualifications to perform those duties, then the statute is unconstitutionally vague. We do not agree.

According to the KRC, Reed raised the vagueness issue for the first time when he filed his petition for judicial review; consequently, he may not assert the issue on appeal. Reed did, in fact, raise the constitutional issue prior to the KRC hearing. Furthermore, we have reasoned that although an issue is generally required to be raised prior to appeal, "[s]ince administrative boards and agencies may not rule on constitutional questions, the

issue of constitutionality must be raised when the case is on appeal before a court of law." *In re Residency Application of Bybee,* 236 Kan. 443, Syl. ¶ 4, 691 P.2d 37 (1984).

The KRC argues that K.S.A. 74-8816(e) must be read in conjunction with subsection (f). Subsection (f) provides in part: "The commission may suspend or revoke an occupation license for any reason which would justify refusal to issue such a license." A licensee may be found unqualified to maintain a license for the same reasons a license applicant may be found to be unqualified to receive an initial license. The KRC must be able to respond if an unqualified person is hired and licensed and then later discovered to be disqualified.

In *Hearn v. City of Overland Park,* 244 Kan. 638, 640-42, 772 P.2d 758, *cert. denied* 493 U.S. 976 (1989), we undertook an analysis of the vagueness concept. We reasoned that "[a] statute is not invalid for vagueness or uncertainty where it uses words of commonly understood meaning. [Citations omitted.] At its heart the test for vagueness is a common-sense determination of fundamental fairness." 244 Kan. at 642.

In the context of statutes which provide administrative agencies with some type of decision-making or enforcement authority, we emphasized that

"when a statute is ambiguous, the interpretation placed upon it by an administrative agency whose duties are to carry the legislative policy into effect should be given great weight and may be entitled to controlling significance when the scope and limitations of the powers of the agency must be determined in judicial proceedings. [Citations omitted.]" *State ex rel. Stephan v. Kansas Racing Comm'n,* 246 Kan. 708, 720, 792 P.2d 971 (1990).

Furthermore,

"[s]tandards to guide an administrative agency in the application of a statute may be inferred from the statutory purpose. Less detailed standards and guidance to administrative agencies are required in order to facilitate the administration of laws in the areas of complex social and economic problems. *Vakas v. Kansas Bd. of Healing Arts,* 248 Kan. 589, Syl. ¶¶ 7, 8, 808 P.2d 1355 (1991)." *Kaufman v. Kansas Dept. of SRS,* 248 Kan. 951, 957, 811 P.2d 876 (1991).

Examples of the type of conduct that would render an individual unqualified are not specified in K.S.A. 74-8816(e)(3). The question is whether an ordinary person, exercising common sense,

would know that Reed's conduct as identified by the KRC would place an individual at risk of losing a license because that person was not qualified.

In *Morra v. State Board of Examiners of Psychologists,* 212 Kan. 103, 111, 510 P.2d 614 (1973), we held that the term "wrongful actions" within K.S.A. 74-5324(e) (Weeks) was not unconstitutionally vague as a ground for revoking or suspending a psychologist's license.

Reed's experience, background, and training are important to the consideration of whether he, or a similarly situated individual, would have adequate warning as to the proscribed conduct. Given Reed's experience, he should have been aware that his conduct could result in the KRC reaching a determination that he was unqualified to hold the license.

Acting to strictly uphold the various regulations which govern racing would be among the necessary eligibility requirements to hold a general manager's license. The term "not qualified to perform the duties associated with the license being applied for" is not inherently vague under the facts in the case at bar. We have characterized terms appearing to be vague as sufficiently definite to withstand constitutional attack. See *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 454, 436 P.2d 828 (1968) (Statute failed to list all examples of prohibited conduct under the term "unprofessional conduct"; the "determination whether by common judgment certain conduct is disqualifying is left to the sound discretion of the board."); *Kansas State Board of Healing Arts v. Acker,* 228 Kan. 145, Syl. ¶ 5, 612 P.2d 610 (1980) ("The terms 'immoral conduct' and 'dishonorable conduct' as used in K.S.A. 1979 Supp. 65-2836 [provisions allowing revocation of license to practice medicine] are not so vague and indefinite that the statute must be declared unconstitutional.").

Our duty is to uphold the statute if there is any reasonable way to do so. Greater leeway is afforded statutes regulating business than those prohibiting criminal conduct in determining constitutional challenges for vagueness. *Guardian Title Co. v. Bell,* 248 Kan. 146, Syl. ¶¶ 2, 3, 805 P.2d 33 (1991).

K.S.A. 74-8816(e)(3) is constitutional. An ordinary person exercising common sense is capable of understanding that conduct which may disqualify initially will continue to render the person

unqualified, even if licensed through oversight. The KRC may employ 74-8816(e)(3) to remedy the situation.

Reed contends that the vagueness of the term "not qualified" fails to adequately guard against arbitrary and discriminatory enforcement. However, he has failed to demonstrate how the KRC's actions in the case at bar were arbitrary or discriminatory. The trial court found the decision of the KRC to be supported by substantial evidence. We agree with the trial court's evaluation of the evidence on the vagueness issue. The KRC's actions were consistent with the general legislative purpose to insure that track operations are held to a standard of utmost integrity. The KRC has discretion to interpret the term "not qualified" and to apply the term to Reed's conduct. The uniquely sensitive nature of parimutuel racing dictates that the KRC's licensing decisions should be afforded deference.

## The KRC Regulations-Vagueness

Reed reasons that the transmission regulations invoked in the telefax charges, K.A.R. 112-11-12(j) and (k) (1991 Supp.), must be considered void for vagueness as they were applied to him. He explains that he raised this issue before the KRC by a motion to dismiss filed before the hearing.

We have vacated the KRC's order as it relates to Reed's violations of K.A.R. 112-11-21(a) (1991 Supp.) as effected by 18 U.S.C. § 1084(a) in Count I and K.A.R. 112-11-21(j) and (k) (1991 Supp.) in Count II; consequently, we do not reach the vagueness contentions relating to administrative regulations.

## Disposition

We find substantial evidence in the record to affirm the KRC's conclusions of law as to:

Count I: Paragraph 9, concerning Reed's violation of K.S.A. 21-3805 (perjury) (Reed had adequate notice to sustain two of the four KRC perjury incident findings, *i.e.*, the denial of any knowledge that gambling information was being received on a telefax machine at the Park and Reed's description of the events in connection with his meeting with Williams) and K.A.R. 112-11-21(a) (1991 Supp.) (a violation of statutory law, perjury, K.S.A. 21-3805[a], while on the grounds of a racetrack);

Count III: The Coleman Washington incident as modified by the KRC (findings of fact, paragraph 12[a]), the Ben Travis incident (findings of fact, paragraphs 12[c]), the Rudy Williams incident (findings of fact, paragraph 12[e]); and Count V.

We affirm: (1) the KRC's revocation of Reed's license under Counts I and III; (2) the Count III fine of $500; and (3) the Count V sanction of excluding Reed from the Wichita Greyhound Park.

We do not find substantial evidence in the record to affirm, and, consequently, we reverse as to:

Count I: Findings of fact, paragraph 6, a violation of K.A.R. 112-11-21(a) (1991 Supp.) as effected by 18 U.S.C. § 1084(a) (transmission of gambling information by wire); and Count II.

We vacate the order as to Count II and the portion of Count I based on a violation of K.A.R. 112-11-21(a) (1991 Supp.) as effected by 18 U.S.C. § 1084(a).

We agree with Reed's contention that he lacked notice of the charges reflected in the KRC findings of fact, paragraph 12(b) (loaning money by an employee of Wichita Greyhound Charities for gambling purposes) and paragraph 12(d) (a track employee placing a wager, contrary to company policy). We find no reference in the charging document of such events.

We vacate the fines, except as to Count III. K.S.A. 1992 Supp. 60-2101(b). We surmise that the fines imposed by the initial order as modified were based on the KRC's judgment in reviewing the totality of Reed's violations. We are mindful of K.S.A. 74-8816(f), which grants the KRC authority to impose fines "not exceeding $5,000 for each violation" in addition to suspending an occupation license.

We do not by our action vacating $5,500 of the initial $6,000 sanction in the case at bar signal that the KRC's use of K.S.A. 74-8816(f) is to be inhibited in any future case.

Affirmed in part and reversed in part.