No. 72,895

MOBIL EXPLORATION & PRODUCING U.S. INC., *et al.*, *Appellants,*
v. THE STATE CORPORATION COMMISSION OF THE STATE
OF KANSAS, SUSAN M. SELTSAM, CHAIR; and F.S. JACK
ALEXANDER and RACHEL C. LIPMAN, COMMISSIONERS, and
THEIR RESPECTIVE SUCCESSORS IN OFFICE AS CONSTITUENT
MEMBERS OF THE STATE CORPORATION COMMISSION OF THE
STATE OF KANSAS, *Appellees.*

(908 P.2d 1276)

Opinion filed December 15, 1995.

*Jennifer Gille Bacon*, of Shughart, Thomson & Kilroy, P.C., of Kansas City, Missouri, argued the cause, and *Thomas A. Sheehan*, of the same firm, and *Evan J. Olson*, and *Marc P. Clements*, of Hershberger, Patterson, Jones & Roth, L.C., of Wichita, and *Daniel P. LeFort*, of Mobil Exploration & Producing U.S. Inc., of Dallas, Texas, were with her on the briefs for Mobil Exploration & Producing U.S. Inc.

*Steven D. Gough*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Gary L. Paulson* and *Eric Nitcher*, of Amoco Production Company, of Denver, Colorado, were with him on the briefs for Amoco Production Company.

*Stanford J. Smith, Jr.*, of Curfman, Harris, Rose, Weltz, Metzger, & Smith, of Wichita, argued the cause, and *John C. Lovett*, associate general counsel, OXY USA Inc., of Tulsa, Oklahoma, was with him on the briefs for OXY USA Inc.

*Charles J. Woodin*, of Foulston & Siefkin, L.L.P., of Wichita, argued the cause and was on the briefs for Vastar Resources, Inc.

*William J. Wix*, assistant general counsel, argued the cause, and *John McCannon*, assistant general counsel, and *Brian J. Moline*, special counsel, were with him on the brief for appellee Kansas Corporation Commission.

*Spencer L. Depew*, of Depew and Gillen, L.L.C., of Wichita, argued the cause, and *James J. Ward, Jr.*, of Anadarko Petroleum Corporation, of Houston, Texas, was with him on the brief for appellee Anadarko Petroleum Corporation.

*James G. Flaherty*, of Anderson, Byrd, Richeson & Flaherty, of Ottawa, argued the cause, and *G. Michael Prescott III*, associate general counsel, and *Thomas H. Hawkins*, senior counsel, of Mesa Operating Company, of Irving, Texas, were with him on the brief for intervenor Mesa Operating Company.

*John Cary*, senior counsel, The Williams Companies, Inc., of Tulsa, Oklahoma, and *Teresa J. James*, of Adams, Jones, Robinson and Malone, Chartered, of Wichita, were on the brief for appellee Williams Natural Gas Company.

*Timothy E. McKee*, of Triplett, Woolf & Garretson, of Wichita, was on the brief for appellee Colorado Interstate Gas Company.

*Joseph F. Furay*, of KN Energy, Inc., of Lakewood, Colorado, and *Jeff Kennedy* and *Ann T. Rider*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, were on the brief for appellee KN Energy, Inc.

*Jane Alseth*, of Northern Natural Gas Company, of Omaha, Nebraska, and *Jeff Kennedy* and *Ann T. Rider*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, were on the brief for appellee Northern Natural Gas Company.

*Jack Glaves* and *Curtis M. Irby*, of Wichita, were on the brief for appellee Panhandle Eastern Pipe Line Company.

The opinion of the court was delivered by

DAVIS, J.: This is a consolidated appeal from the district court's opinion affirming the Kansas Corporation Commission's (KCC) amendments to the Basic Proration Order (BPO) controlling the Hugoton Gas Field in Kansas. The parties, procedural development, and issues raised on appeal are set forth below. Our standard of review is governed by K.S.A. 77-621 of the Act for Judicial Review and Civil Enforcement of Agency Actions.

## BRIEF HISTORY AND BACKGROUND

The Hugoton Natural Gas Field was discovered in the 1920's. The first gas well was drilled in 1927, four miles southwest of Hugoton, in Stevens County. At present, the gas field is 160 miles long and varies from 40 to 72 miles in width. There are 5,854 wells that cover portions of 11 counties in the southwest corner of Kansas. The field extends across the Oklahoma panhandle and into portions of several counties in northern Texas. Existing wells have drained

approximately 20 trillion cubic feet (Tcf) of the 30 Tcf of recoverable reserves in the reservoir. Production from the field in the year 1993 was approximately 400 billion cubic feet (Bcf) of gas. See Lipman, *Hugoton Gas Field: The Ongoing Battle Over Allowables, Underage, and Infill Wells*, 33 Washburn L.J. 852 (1994).

The gas in the Hugoton Field comes from a common pool. In the absence of any statutory regulation, the common-law rule of capture applies to a common pool. At common law, the owner of a tract of land acquired title to the oil and gas which the owner produced from wells drilled thereon even though it could have been proved that part of such oil or gas migrated from adjoining lands. The rule promotes excessive drilling and production, resulting in economic waste and damage to reservoirs. Kansas enacted the Natural Gas Conservation Act in 1935 to prevent such waste and to protect the rights of adjoining owners. G.S. 1935, 55-701 *et seq.*

The statutes governing the production and conservation of natural gas in Kansas empower the KCC to prevent waste, avoid uncompensated drainage, and assure orderly development and production of natural gas in Kansas. Along with the prevention of waste, the KCC is directed to prevent the unfair or inequitable taking of natural gas from a common source of supply. This concept of equitable recovery of a common pool is known as correlative rights. Correlative rights means that each owner or producer in a common source of supply is privileged to produce that source only in a manner or amount that will not (a) injure the reservoir to the detriment of others, (b) take an undue proportion of the obtainable oil or gas, or (c) cause undue drainage between developed leases. K.A.R. 82-3-101(17) (1992).

On March 21, 1944, the KCC issued its BPO, which forms the basis of the proration order currently in effect for the Hugoton Field. A proration order attempts to ensure that each owner will recover, without waste, the amount of gas underlying his or her land. The 1944 BPO, therefore, prescribed a formula to be used in fixing quotas for each well so that each developed lease would be able to currently produce its daily quota, called an allowable. The 1944 BPO has been amended over time either as the result

of an application filed by one of the producers in the Hugoton Field or as the result of an order to show cause issued by the KCC. Any modifications have always been effected only after extensive hearings before the KCC. This case is no exception.

The major points addressed in this appeal involve basic and significant amendments to the BPO. As noted by the district court, the KCC conducted evidentiary hearings on proposed amendments to the BPO between August 17, 1992, and July 24, 1993. During the course of those hearings, 29 qualified expert witnesses gave detailed technical testimony on behalf of 26 parties. The hearings resulted in a transcript of over 10,000 pages and over 500 exhibits containing conflicting and contradictory expert testimony.

On February 2, 1994, the KCC issued its order amending the BPO. Nine parties filed petitions for reconsideration before the KCC. The KCC made several modifications and clarifications to the February 2, 1994, order but denied reconsideration in all other respects. The KCC 1994 amendments were affirmed on appeal by the district court.

## ADDITIONAL BACKGROUND RELATING TO AMENDMENTS

The 1944 BPO set a production quota for each well in the field which was identified as an "allowable." The allowable for each well, the amount the well will be able to produce in a 1-month period, is arrived at through the use of a formula which takes into account surface acreage and the ability of a well to produce. Both of these factors were changed by the 1994 amendments.

One of the principal components of the formula to determine a well's allowable is the surface acreage. Since 1936, practically all drilling in the Hugoton Field has occurred upon 640-acre tracts with one well per tract. The 1944 BPO adopted 640 acres as the acreage unit to be used in the proration formula. In 1986, after extensive hearings, the KCC concluded that one well per 640 acres could not effectively and efficiently drain the 640 acres without causing waste. The KCC therefore modified the BPO to allow each operator, at its option, to drill an additional or infill well on any tract of land over 480 acres. The acreage factor in the basic pro-

ration formula is calculated by dividing the acreage attributed to the well by 640. The acreage factor of a lease with one well is 1.0, or 640 divided by 640. For those units with an infill well in addition to the original well, the acreage factor, consistent with the 1986 KCC amendment, was determined by assigning both the original and the infill well an acreage factor of 0.5 times the total acreage of the unit divided by 640. Thus, the acreage factor for the original well on a 640 acre tract would be 0.5 and the acreage factor for the infill well would also be 0.5. The KCC, by its 1994 amendment, adjusted the acreage factor of those units with infill wells, increasing it from 0.5 for the original well and 0.5 for the infill well to .65 for the original well and .65 for the infill well.

The two other major factors involved in the formula to determine a well's allowable are the deliverability factor of a well and market demand. Market demand is determined from two market demand hearings conducted by the KCC in March and September each year wherein the producers submit their estimates of market demand for their gas for the 6-month period. Based upon these estimates, the KCC determines the market demand. However, market demand is not directly involved in this appeal.

The deliverability factor, which is an important consideration in this appeal and which is discussed at length below, is the ability of the well to produce against a standard pressure. This factor takes into account the pressure of the well, the open-flow from the well, and the porosity and thickness of the gas-bearing rock. The 1994 amendment changed the effect of the deliverability factor on the assignment of allowables. The KCC determined that no well would receive an allowable in excess of its demonstrated capacity to produce, defined as the average of the highest 3 months' production in the preceding 12 months.

Highly summarized, the BPO formula reaches an allowable for each well by dividing the total market demand for the field by the sum of the products of deliverability times the acreage factors of all wells in the field. The resulting figure, called the proration factor of the field, is then multiplied by the product of the deliverability times the acreage factor of each well. The result is the allowable, in cubic feet, for the well for the proration period. The allowable

period is a calendar month. The allowable is then the amount of gas per month that a well may produce.

If at the end of a monthly proration period a well has not produced its allowable, the amount not produced, called underage, is carried forward and added to the well's allowable in the next period. Likewise, any well that overproduces during the monthly proration period will have the overproduction, called overage, charged against its allowable for the next period. When a well accumulates overage in an amount equivalent to six times its current allowable for the preceding January, the well must be shut in and not produced until its overproduction is reduced by its new allowable to a figure no more than five times its allowable for the preceding January. When a well's underage reaches a figure in excess of nine times the current allowable for the preceding January, that excess underage is canceled. For underage canceled after 1984, an operator had 3 years from the date of cancellation to request reinstatement and then had up to 5 years to produce the underage or have it permanently canceled.

The 1994 amendment provided that beginning on January 1, 1994, underage shall be produced by the end of that next calendar year or be permanently canceled. It stated that underage existing on the KCC's December 1993 proration schedule and all underage canceled in 1991, 1992, and 1993 that is reinstated before May 31, 1994, must be produced by December 31, 2003, or be permanently canceled. Unlike the pre-1994 amendments, the KCC provided that underage on units containing an infill well may be produced as unit underage from either the original or the infill well.

The amendments which are the subject of this case arose out of an application made by OXY USA, Inc., (OXY) on May 13, 1992. OXY's application argued that the BPO was not fulfilling its statutory mandates and proposed that the original well and infill well on a unit each be given an acreage factor of 1.0 times the total acreage of the unit divided by 640 instead of the 0.5 times the total acreage that they were currently receiving. OXY also proposed that the BPO be modified so that when underage is canceled it is permanently canceled and respread the next month as allowable to other wells in an overproduced status. OXY proposed that all cur-

rent underage accumulated prior to the date of the new amendments be required to be reinstated and produced by December 31, 1994, or be permanently canceled. OXY further proposed that no well except one in an overproduced status be assigned an allowable in excess of its demonstrated capacity to produce, which OXY would define as the largest volume of gas produced in any month of the 12 preceding months.

The KCC expanded the issues to include hearings on well testing, allowing all canceled underage to be produced as unit underage, amending the definition of nominations for the purpose of setting market demand, and amending the deliverability standard pressure. Mobil Exploration & Producing U.S. Inc., (Mobil) also filed a request to expand issues to include modification of the deliverability formula and the acreage factor. The KCC consolidated all the issues and set them for hearing.

The KCC amended the BPO by adjusting the acreage factor of those units with infill wells, increasing it from 0.5-0.5 to .65-.65, although stopping far short of OXY's proposed 1.0-1.0. The KCC also amended the underage provision, providing a 10-year period in which all existing reinstated or canceled underage must be produced or be permanently canceled and further providing that any new canceled underage must be produced within 1 year of the time that it is canceled or be permanently canceled.

Upon petition for review of the KCC 1994 amendment, filed before the Shawnee County District Court pursuant to K.S.A. 77-601 *et seq.*, the court found that there was no basis to disturb the decision of the KCC and affirmed. Mobil, Amoco Production Company, (Amoco), OXY, and Vastar Resources, Inc., (Vastar) now appeal this decision, raising five issues. The first issue we deal with involves the acreage factor amendment, and along with this issue Mobil contends that the KCC improperly limited its cross-examination. In the third issue, Amoco contends that the KCC erred by limiting a well's allowable to its demonstrated capacity to produce. OXY and Vastar contend in the fourth issue that the KCC erred by expanding the time allotted to produce existing underage. Finally, OXY argues that it was error to allow certain pipeline com-

panies to intervene in this action. We begin with the first assigned error regarding the acreage factor amendment.

## I. THE ACREAGE FACTOR AMENDMENT

Mobil appeals from that part of the 1994 amendment which adjusted the acreage factor of those units with infill wells, increasing it from 0.5 for the original well and 0.5 for the infill well to .65 for each well. Amoco does not appeal on this issue but supports Mobil's position. Mobil's arguments may be identified as follows: (a) legal argument based on correlative rights; (b) lack of evidence to support the amendment; (c) lack of statutory basis for amendment; (d) lack of required findings; and (e) lack of evidence supporting the specific acreage factor of .65.

### (a) Correlative Rights

Mobil contends that the KCC erred in increasing the acreage factor to create incentives for the drilling of infill wells. Mobil argues that the KCC may not create production incentives unless they are necessary to protect correlative rights and that there is no evidence that the incentives would serve that purpose. According to Mobil, the increase will instead allow unreasonable discrimination against regular production units.

K.S.A. 55-703(a) defines the KCC's rights and duties to regulate the production of natural gas from a common source of supply:

"Whenever the available production of natural gas from any common source of supply is in excess of the market demands for natural gas from the common source of supply, or whenever the market demands for natural gas from any common source of supply can be fulfilled only by the production of natural gas from the common source of supply under conditions constituting waste, or whenever the commission finds and determines that the orderly development of and production of natural gas from any common source of supply requires the exercise of its jurisdiction, then any person, firm or corporation having the right to produce natural gas from the common source of supply may produce only that portion of all the natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying the developed lease and currently produce proportionately with other developed leases in the common source of supply without uncompensated cognizable drainage between separately owned, developed leases or parts thereof."

This same statute provides that the KCC shall

"regulate the taking of natural gas from any and all common sources of supply within this state in order to prevent the inequitable or unfair taking of natural gas from a common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of any one common source of supply as against another and in favor of or against any producer in any common source of supply. In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent."

The KCC is vested with three responsibilities under the provisions of K.S.A. 55-703: (1) It must first of all prevent waste of the natural resource, (2) it must allow sufficient production to meet the market demand if such can be done without waste, and (3) it must protect correlative rights. *Colorado Interstate Gas Co. v. State Corporation Comm.*, 192 Kan. 1, 24, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964). In *Colorado Interstate Gas Co.*, we stated:

"In a gas field such as the Kansas-Hugoton where five major companies are taking gas through separate pipelines not connected to the same wells, the responsibilities placed upon the Commission will clash. If the market demand cannot be supplied without waste, or if correlative rights cannot be protected without waste, or if correlative rights cannot be protected without unduly restricting production needed for the market demand, one of the three, waste, market demand, or correlative rights, must suffer. The domina[nt] purpose of [K.S.A. 55-701 *et seq.*] is to prevent waste. [Citation omitted]." 192 Kan. at 24-25.

Mobil's argument, that the KCC cannot create production incentives unless they are necessary to protect correlative rights, ignores the broad authority vested in the KCC to prevent waste in the production of oil and gas. See *Hartman v. State Corporation Commission*, 215 Kan. 758, 768, 529 P.2d 134 (1974). Nevertheless, Mobil argues that *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n*, 237 Kan. 248, 699 P.2d 1002 (1985), *vacated and remanded* 475 U.S. 1002, 89 L. Ed. 2d 289, 106 S. Ct. 1169 (1986), *aff'd on remand* 240 Kan. 638, 732 P.2d 775 (1987), supports its argument on correlative rights. *Northwest Cent. Pipeline* also dealt with modifications to the BPO governing the Hugoton Field.

Mobil notes that in *Northwest Cent. Pipeline* we said:

"While selling gas is not a function of the KCC, except tangentially through setting allowables, nor is the providing of incentives for additional production a KCC function, when additional production is needed to protect correlative rights, the KCC has authority to create such incentives." 237 Kan. at 264-65.

According to Mobil, because *Northwest Cent. Pipeline* mentioned only the need to protect correlative rights as justification for the KCC providing production incentives, the KCC has no authority to create production incentives to prevent waste. Mobil's reading of *Northwest Cent. Pipeline* is extremely narrow and conflicts with the following language:

"Selling gas is not a function of the KCC, nor is the providing of incentives for additional production, but when additional production is needed to protect correlative rights *and to prevent waste*, the commission has authority to create such incentives." 237 Kan. 248, Syl. ¶ 7. (Emphasis added.)

Mobil recognizes the language in Syllabus ¶ 7 but argues that statements in a syllabus should be interpreted in light of the facts and questions presented in the case. Mobil acknowledges that there was no issue of waste in *Northwest Cent. Pipeline*. Had there been waste, as in the case we now address, there can be no doubt that the KCC would have been empowered to act. This court recognized in *Northwest Cent. Pipeline* that the KCC's duty is to prevent waste and protect correlative rights. 237 Kan. at 254. Mobil's contention that *Northwest Cent. Pipeline* stands for the proposition that the KCC may not adopt production incentives in order to protect against waste is without merit and contrary to well-established law in Kansas.

In *Colorado Interstate Gas Co.*, 192 Kan. at 25, we said that the dominant purpose of the KCC's authority in regulating production from common sources of supply is to prevent waste. In *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 184, 769 P.2d 1 (1989), another case concerning the BPO controlling the Hugoton Field, we stated: "The first [question presented] is whether the Commission has authority over the field when action is unnecessary to protect correlative rights. We hold it clearly does. The prevention of waste is the Commission's foremost function. K.S.A. 55-701; [Citations omitted.]" The KCC is vested with the broad power to regulate the Hugoton Field in order

to prevent waste, meet market demand, and protect correlative rights. This includes the power to create production incentives in order to accomplish these objectives.

**(b) Evidence Supporting Change in Acreage Factor**

**(1) Scope of Review**

The scope of appellate review of an administrative agency's order is to determine whether the district court reviewed the order in accordance with its statutory responsibility. *Southwest Kan. Royalty Owners Ass'n*, 244 Kan. 157, Syl. ¶ 1. This court exercises the same review of the agency's action as does the district court and must accept as true the evidence and all inferences to be drawn therefrom which support of tend to support the findings of the trial court. *Reed v. Kansas Racing Comm'n*, 253 Kan. 602, 609-10, 860 P.2d 684 (1993). This court is to disregard any conflicting evidence or other inferences which might be drawn therefrom. 253 Kan. at 610.

A party seeking relief from an action of the KCC has the burden of showing that an agency's order is invalid for one of the following reasons:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

## (2) Evidence

Mobil argues that the amendment was not supported by substantial evidence in that the evidence did not demonstrate that raising the acreage factor was necessary in order to protect correlative rights or to prevent waste. When reviewing a decision of the KCC for substantial evidence, the court must observe several limitations. Neither the district court nor this court may substitute its judgment for that of the administrative agency. As long as the record contains substantial competent evidence supporting the agency decision, the decision is reasonable and must be upheld by this court. *Southwest Kan. Royalty Owners Ass'n,* 244 Kan. at 165. This is true even though there may be conflicting evidence which would support a contrary result. The KCC is vested with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, 511, 561 P.2d 779 (1977). The court may not set aside an agency order merely because the court would have reached a different conclusion if it had been the trier of fact. Only in those cases where the evidence shows the KCC's determination is so wide of the mark as to be outside the realm of fair debate may factual finding be set aside. *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n,* 242 Kan. 470, 474, 749 P.2d 21 (1988).

The question of whether the acreage factor in the BPO should be changed was extensively argued before the KCC through the use of both prefiled and live testimony. As explained at the outset, the original acreage factor in the BPO for properties with only one well was 1.0 for every 640 acres, which meant that a single well on a 640-acre tract could produce its allowable each year. As a result of a KCC 1986 amendment, a lease with an original well and an infill well was granted an acreage factor of 0.5 for the original well and 0.5 for the infill well. The factor for a lease with one well and the factor for a lease with an original well and infill well was the same, *viz.,* 1.0.

OXY's proposal was to change the acreage for the lease with an original and infill well to 1.0-1.0 on the grounds that the infill wells would recover reserves that would be unrecoverable in their ab-

sence, thus preventing waste. This proposal and the need for some change in the acreage factor was the subject of much debate.

Stanley W. Kleinsteiber, a petroleum engineering associate for Amoco, testified that his work suggests that 30% of Amoco's leases will see an increase in incremental reserves through such infill drilling. He testified that OXY's proposed change to a 1.0-1.0 acreage factor would be too burdensome on operators in the field in that it would force the operators to drill infill wells even where they are not needed because of the risk of losing the allowable.

Gregory P. Womack, an Amoco staff petroleum engineer, also testified against OXY's proposal. He estimated that infill drilling could potentially result in the recovery of an additional 3.5 to 5.0 Tcf of gas reserves but that 1.0-1.0 is too high an acreage factor to use. According to Womack, a 1.0-1.0 acreage factor would mean that the infill well was essentially doubling the field's reserves, while his studies showed that infill drilling would only increase reserves by approximately 29%. Womack stated that raising the acreage factor to 1.0-1.0 would eliminate the optional nature of infill drilling and cause waste because operators would be forced to drill unnecessary infill wells to gain the extra production allowable.

William E. Ward, a regulatory engineer for Mobil, testified that in his opinion, infill wells are unnecessary to drain the field and avoid waste. Ward stated that new infill wells will actually promote waste because more gas will be taken from the wells and the gas will migrate to the low pressure areas of the field. Ward conceded that some individual leases have increased their reserves through the use of infill wells but felt that the 1.0-1.0 ratio suggested by OXY would be inconsistent with the orderly drainage of the field.

Gregory J. Natyzak, a gas business coordinator for the Mid-Continent Region of OXY, testified in support of the proposed acreage increase. According to Natyzak, a second well is needed on each lease to fully recover the reserves, yet only 35% of the units have infill wells. He attributed the small number of infill wells to the existent acreage factor. Natyzak testified that the 0.5-0.5 acreage factor for leases with an original well and an infill well actually discourages infill drilling and penalizes those who engage in it be-

cause the infill well must be able to produce as much gas as the original well in order for the production to remain the same. In his opinion, the acreage factor was in need of modification and the plan proposed by OXY would prevent waste, protect correlative rights, and satisfy market demand.

Joseph D. Candella, an operations analytical engineer for Atlantic Richfield Company (later Vastar), testified in support of OXY's plan. Candella testified that because natural gas migrates to low pressure areas, Kansas wells in the Hugoton Field must increase their production to match production in Oklahoma and Texas. According to Candella, Oklahoma wells with increased production have a lower pressure and are actually draining natural gas reserves from Kansas. He stated that increasing the acreage factor would make infill drilling more economical. In his opinion, if more infill wells are drilled, incremental reserves will be added, physical waste will be eliminated, infill economics will be positive, correlative rights will be protected, and the pressure differential between Kansas and Oklahoma will be reduced.

Del L. Craddock, a staff operations engineer for Santa Fe Minerals, testified that infill drilling would allow the wells in the Hugoton Field to produce much closer to capacity. However, according to Craddock, it is not economical to drill infill wells if the acreage factor stays the same. Craddock testified that at the current rate of allowable production, many Santa Fe wells will not be able to stay in operation long enough to recover the gas beneath their sections.

Dennis E. Fagerstone, a vice-president of exploration and production for Mesa Operating Company (Mesa), testified that studies indicated infill wells were currently producing an average of 4% of additional reserves. However, Mesa's own in-house studies estimated that 15% additional reserves would be recovered from infill drilling.

Sam A. Giovinco, an area engineering supervisor for Mesa, testified that the current acreage factor is uneconomic. According to Giovinco, with the current acreage factor 0.5-0.5, it is possible to receive a decrease in allowable production for a unit that is infilled where the infill well is not in an as desirable location as the original

well. As a result, an infill operator, even though substantially increasing the reserves in the field, is penalized for drilling an infill well. Giovinco testified that the exact increase in reserves is not quantifiable at this point because there is not enough data yet collected on the infill wells that have been drilled so far. However, Giovinco testified that infill well pressures have been generally higher than on the original wells, which would indicate that additional reserves are being encountered.

K. Todd Montgomery, a reservoir engineer for Anadarko Petroleum Corporation (Anadarko), in his prefiled testimony with the KCC, stated that infill drilling is of vital importance to the Hugoton Field. He concluded that wells in the field are likely to develop casing failure as they get older and an infill well will be necessary to properly drain the reserves. If infill wells are drilled early in the well life when pressure is higher, more gas may be recovered then if they are drilled later in the life of the well when pressures are lower. Under cross-examination by Amoco, he stated that Anadarko, using a three-dimensional modeling system for the Hugoton Field, was able to quantify its increase in reserves at a minimum of 120 Bcf in 1991. According to Montgomery, Anadarko believes that it will recover more reserves in the future.

Don Ray George, a consulting petroleum engineer for his own company, Don Ray George and Associates, presented prefiled testimony on the acreage factor issue. George testified that without infill drilling, production in the Hugoton Field will undergo a dramatic decline. George stated that infill drilling will not continue unless the acreage factor is increased. In his opinion, higher rates of production will not lead to the recovery of less gas but will, instead, cause additional depletion in areas of the reservoir that current wells are only partially depleting, thus recovering more otherwise unrecoverable reserves. He stated that correlative rights will not be violated by an increase in the acreage factor but that correlative rights are protected by the KCC, giving all operators the same opportunity to effectively develop their leases. At the current acreage factor, operators who do not infill drill are beneficiaries of the additional allowable created by operators who do infill drill.

Dr. Jerry Vairogs, a reservoir engineering consultant for OXY, testified by prefiled testimony and by live testimony. He stated that there is more gas in the Hugoton Field than was projected by Mobil. Without infill drilling, all of the gas underlying the leases in the Hugoton Field will not be recovered in a timely manner, if at all. He also testified that Mobil's fears concerning the violation of correlative rights if a higher acreage factor is adopted are not credible. According to Vairogs, gas in the Hugoton Field does not flow from one lease to another lease several miles away due to the drainage patterns prevalent in the area. In his live testimony, he stated that there is no way to determine the amount of additional reserves that are being recovered by infill drilling because infill drilling has been in activity for such a short time.

Thomas C. Ryan, a reservoir engineering advisor for Mobil, presented prefiled testimony against a change in the acreage factor. Ryan admitted that on the edge areas of the field, infill wells might find significant incremental reserves. However, according to Ryan, in most of the field, the permeable layers are laterally connected and, therefore, there are no significant incremental reserves that cannot be drained by one well per lease. While there may also be incremental reserves in the lowest permeability layers, they will be uneconomical to recover. In Ryan's opinion, most infill wells are not contacting significant new reserves, and there is no justification for any significant increase in the acreage factor. He did concede that there is evidence that new reserves are being added in various parts of the field.

Leroy D. Bradley, a technical supervisor for Mobil's Liberal asset team, also presented testimony. He testified that although an infill well will drain more gas, most of it will come from adjacent sections and, thus, rather than protecting correlative rights, the use of an infill well will violate them unless the acreage factor is kept at 0.5-0.5. He did, however, admit that some of the infill wells have a continued higher pressure than the original wells on the lease, which would indicate that they are developing new reserves.

### (3) Conclusion

The KCC was presented with a variety of evidence as to the necessity and the advisability of a change in the acreage factor. Mobil's contention that there was no evidence a change in acreage factor was necessary to protect correlative rights or to prevent waste is not supported in the record. The record is replete with evidence that the 0.5-0.5 acreage factor was causing a loss of allowable for those drilling infill wells, even though the wells were resulting in the discovery of new reserves. Moreover, there is a large body of testimony which tends to show that infill wells are necessary to properly drain the Hugoton Field without waste and that the 0.5-0.5 acreage factor was inhibiting the drilling of infill wells. Experts such as Del Craddock, a staff operations engineer for Santa Fe Minerals, testified that at the current rate of allowable production and without the drilling of more infill wells, many Santa Fe wells will not be able to stay in operation long enough to recover the gas beneath their sections.

Mobil asserts that there was no substantial competent evidence that infill drilling has or will develop new reserves. However, Mobil's own reservoir engineering advisor, Thomas Ryan, conceded that in some areas of the field, infill wells might find significant incremental reserves. Leroy Bradley, also a Mobil witness, admitted that some infill wells have continued higher pressure than the original well on the lease, which would indicate that some of them are developing new reserves. Other witnesses before the KCC testified that although there is not enough information available to quantify the exact increase in new reserves made available through infill drilling, studies have shown additional reserve production.

In order to find, as Mobil suggests, that there is no evidence infill drilling is necessary to protect correlative rights or to prevent waste, we would have to accept only the evidence produced by Mobil and disregard other conflicting evidence. Our mandate is exactly the opposite. We exercise the same review of the agency's action as does the district court and must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the agency. We disregard any con-

flicting evidence or other inferences which might be drawn therefrom. See *Reed v. Kansas Racing Comm'n*, 253 Kan. 602, 609-10, 860 P.2d 684 (1993). To the extent that Mobil suggests its evidence is of better quality than that of the other experts in the case, we must remember that it is for the KCC rather than this court to determine what weight evidence should be given. " 'Nothing can be gained by making a comparison of conflicting testimony. The commission is the trier of facts. The commission had the expertise through its staff to sift and evaluate . . . conflicting testimony.' [Citation omitted.]" *Southwest Kan. Royalty Owners Ass'n*, 244 Kan. at 166.

As long as the record contains substantial competent evidence in support of the decision of the KCC, its decision is reasonable and must be upheld by this court. 244 Kan. at 165. The record contains evidence that infill drilling discovers new incremental reserves, but even if there was no evidence of new reserves, the KCC is free to change the acreage if the evidence shows that without infill drilling, waste will occur or correlative rights will be violated. The record also contains evidence that without a change in the acreage factor, those companies with infill wells are actually losing allowables, that infill wells are necessary to properly drain the Hugoton Field, and that without the increased productivity from infill wells, gas from the Kansas portion of the Hugoton Field is lost to Oklahoma wells. The KCC's finding that change in the acreage factor was necessary to protect correlative rights and prevent waste is supported by substantial competent evidence.

(c) Statutory Authority of KCC

Mobil contends that the KCC acted beyond its statutory authority in increasing the acreage factor because it has the duty under K.S.A. 55-703(a) to prevent unreasonable discrimination in favor of or against one producer in a common source of supply. Mobil argues that the increase in acreage factor will result in some wells not being allowed to produce the amount of gas underlying their leases and will discriminate against those leases which do not have infill wells.

According to Mobil, the increased acreage factor results in an advantage to leases with infill wells because it gives those leases 30% more allowable production than similar leases without infill wells. A lease with both an original well and an infill well would receive .65 allowable for the original well and .65 allowable for the infill well for a total of 1.30, while a lease with only an original well receives 1.0. Mobil claims that this built-in discrimination is outside the statutory authority of the KCC because it violates correlative rights.

The KCC does have the statutory duty to prevent the inequitable or unfair taking of natural gas from a common source of supply by any one producer. K.S.A. 55-703(a). However, Mobil's argument ignores the fact that the KCC's foremost function and the dominant purpose of K.S.A. 55-703 is to prevent waste. See *Southwest Kan. Royalty Owners Ass'n*, 244 Kan. at 184; *Colorado Interstate Gas Co. v. State Corporation Comm.*, 192 Kan. 1, 25, 386 P.2d 266 (1963).

Substantial competent evidence supports the conclusion that infill wells are necessary in order to completely recover the gas reserves underlying the Hugoton Field. However, at the current acreage factor, infill well drillers were actually being penalized for drilling infill wells unless the infill well's production equalled at least 50% of the allowable share for the entire lease. Under these circumstances, a change in the acreage factor was necessary in order to prevent discrimination against infill wells and to encourage the drilling of infill wells, where necessary, to completely recover the gas underlying each lease. "The Commission is required to afford each owner the 'right or opportunity' to produce his share." 192 Kan. at 25. The KCC's order allows those leases with infill wells a chance to produce their share of the gas without penalty and at the same time prevents waste by encouraging the drilling of infill wells where necessary. As a result, the KCC did not act beyond its statutory jurisdiction in changing the acreage factor.

## (d) Required Finding

Mobil contends that the KCC was required to find that infill wells were resulting in the discovery of incremental reserves and

that its failure to explicitly decide this issue prohibits it from increasing the acreage factor. Mobil argues that this court must grant relief because under K.S.A. 77-621(c)(3), the KCC "has not decided an issue requiring resolution."

## (1) The Trial Court's Decision

In addressing this issue the trial court concluded:

"The issue of infill drilling was originally addressed by the KCC in 1986 when extensive hearings were conducted and an Order establishing the guidelines for infill drilling put into place. That Order was reviewed by the courts and upheld by the Kansas Supreme Court as being based on substantial competent evidence. *Southwest Kansas Royalty Assoc.*, 244 Kan. at 157.

"However, despite the fact that Mobil and others have stated that they did not want to retry the infill issue, Mobil now complains that the findings from the 1986 infill hearings cannot be relied upon. If Mobil is seeking a re-evaluation of the 1986 infill order findings which stated that infill drilling would increase reserves and prevent waste, then Mobil's appropriate remedy is to petition the KCC for new hearings to determine the benefits and detriments of infill drilling in the field. The court on review will not upset a valid exercise of authority by an administrative agency based on the accusation that an issue which was never properly brought up at the agency hearings was not decided upon by the agency. The KCC lawfully relied upon the earlier findings from the 1986 infill hearings when evaluating the proposed amendment to the acreage factor for infill wells, and properly took notice of those findings and orders without objection.

"Based on evidence from the 1986 infill hearings the KCC found that waste of field reserves would occur if infill drilling were not accomplished. Evidence presented at the recent amendment hearings indicated that an increase in the acreage factor for infill wells was necessary to further encourage the drilling of infill wells. In light of all the evidence, the KCC ordered an increase in the acreage factor for infill wells so that waste of reserves could be avoided. The KCC clearly did not fail to decide an issue requiring resolution, and therefore shall not be overturned on review."

## (2) Discussion and Analysis

We agree with the trial court. Moreover, the increase in new reserves provided by infill wells was simply one factor in the KCC's decision to increase the acreage factor for wells. The KCC determined that "credible evidence has been presented to the effect that the drilling of infill wells will maximize ultimate recovery of reserves in a timely manner." This finding takes into account not only the incremental recoverable reserves but also the decrease in

recovery time and the ability to efficiently drain the gas provided by infill wells in order to prevent waste. We conclude that the KCC did not fail to decide an issue requiring resolution.

(e) Whether the .65-.65 Acreage Factor is Supported by Evidence

Mobil contends that the .65-.65 acreage factor adopted by the KCC is unsupported by substantial competent evidence. Mobil asserts that because OXY's proposal was for a change to a 1.0-1.0 acreage factor and because the other parties either supported that factor or did not want a change, the KCC could only adopt one argument or the other.

This argument ignores the great weight of the evidence which established that: (1) the current acreage factor was in need of change as it actually penalized producers for drilling infill wells and increasing gas reserves and (2) OXY's proposed change to a 1.0-1.0 acreage factor was too great a change as it would have credited infill drilling with doubling the reserves in the field, while all evidence pointed to substantially smaller increases in reserves. The evidence introduced supported a change in the acreage factor but not to the extent argued by OXY in its original proposal. Under these circumstances, it was incumbent upon the KCC to determine what the new acreage factor should be. As we noted in *Southwest Kan. Royalty Owners Ass'n*, 244 Kan. at 166, the KCC has the expertise through its staff to sift and evaluate conflicting testimony. The .65-.65 acreage factor adopted by the KCC falls within the range of reasonableness and is supported by the evidence presented. It is not so wide of the mark as to be outside the realm of fair debate. Therefore, it will not be disturbed on appeal. See *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 474, 749 P.2d 21 (1988).

## II. LIMITATION OF CROSS-EXAMINATION

In an issue related to the KCC's adoption of the .65-.65 acreage factor, Mobil contends it was denied the right to cross-examine certain witnesses concerning whether or not incremental reserves are being discovered by infill drilling. According to Mobil, the question of whether infill drilling actually resulted in the discovery

of incremental reserves was an important issue in the case, and the KCC denied it due process of law by prohibiting cross-examination.

(a) Background

The first of the two incidents concerning this issue occurred during the examination of Vastar's expert witness, Joseph D. Candella. Mobil's counsel asked Candella if Vastar had seen any significant increase in its reserves due to infill drilling. Candella answered that Vastar had made estimates of its reserves from infill drilling. At this point, Vastar's counsel objected to the line of questioning, stating that any increased reserves as the result of infill drilling were confidential and proprietary information. KCC Commissioner Rachel Lipman stated that the cross-examination could continue but that it would be monitored very closely. Mobil's counsel stated that he did not want to inquire about booked reserves but instead simply wanted to ask about reserves attributable to infill drilling. The Commissioner stated that questioning could continue along those lines.

Mobil's counsel asked what the estimates were; Vastar's counsel again objected. Mobil's counsel stated to the Commissioner that he was only looking for a ballpark figure. Vastar's counsel argued that the percentage itself was proprietary information. After some argument, the Commissioner determined that parties would be allowed to ask whether increased reserves were attributable to the Hugoton Field and that specific information would be received under seal by the KCC and not subject to cross-examination. The information would be looked at and reviewed in connection with the final ruling. Candella then testified that Vastar had seen increased reserves from its infill drilling.

The second incident complained of by Mobil occurred during the cross-examination of Anadarko's witness, K. Todd Montgomery. Mobil asked Montgomery if significant incremental reserves were being obtained from infill wells, to which Montgomery testified, "You better believe it." Mobil then asked whether Anadarko had made any studies in that regard, to which Montgomery answered, "Yes." He stated that in his testimony, he had not included any evidence of increased reserves because he did not want to retry

the infill drilling issue. Counsel for Anadarko objected on the basis that the information was confidential. The Commissioner allowed counsel to inquire about the studies conducted without asking for specific numbers.

## (b) KCC Action

The KCC issued an order on November 13, 1992, governing how each party's studies on infill drilling would be submitted under seal. The order stated, in part:

"On October 21, 1992, the Commission ruled that the incremental reserve data of the producers in the Hugoton field is relevant to this proceeding. Many of the producer/parties to this proceeding object to the introduction of this information as proprietary and confidential and therefore inadmissable. While acknowledging that this data is possibly proprietary and confidential, at least to the extent that this data has not already been disclosed through publicly available documentation, the Commission rules this information to be vital and clearly relevant to the proceeding.

"Accordingly, the Commission finds that the disclosure of this information to the Commission and Commission staff 'will significantly aid the commission in fulfilling its functions' and that any potential harm related to the alleged confidential nature of the data will be avoided by having the information submitted under seal and not subject to cross examination. *See* K.S.A. 66-1220a."

K.S.A. 66-1220a(a) is a statute dealing with the disclosure of trade secrets and confidential information by the KCC. It states that the KCC shall not disclose or allow inspection by anyone of a trade secret or other confidential information unless the KCC finds that the disclosure is warranted by certain factors. One of the factors to be considered is whether the disclosure will significantly aid the KCC in fulfilling its functions. K.S.A. 66-1220a(a)(1).

Several parties objected to the KCC's November 13 order set forth above; these objections were heard by the KCC on January 11, 1993. At this hearing, the KCC's counsel stated to the Commissioner that rather than risk the disclosure of confidential information, it might be better for the KCC to make its decision concerning the addition of incremental reserves by infill wells solely on the basis of the information which had already been filed with the KCC and had been subject to cross-examination. The KCC

agreed and issued the following order rescinding its November 13 order:

"The Commission finds that, requiring all producing parties to submit incremental reserve estimates and supporting data is no longer essential to a determination of this matter and would be redundant to evidence already in the record. Therefore, the Commission should rescind its Order of November 13, 1992."

## (c) Mobil's Contention

Mobil contends that by restricting its right to cross-examine Candella and Montgomery and by not requiring that studies on infill drilling be made available, the KCC denied Mobil due process of law. Mobil argues that in so doing, the KCC engaged in an unlawful procedure or failed to follow prescribed procedure. See K.S.A. 77-621(c)(5).

## (d) Discussion and Analysis

An administrative body empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of a judicial nature is acting in a quasi-judicial capacity. *Adams v. Marshall*, 212 Kan. 595, 599, 512 P.2d 365 (1973). We have stated that the full rights of due process present in a court of law do not automatically attach to a quasi-judicial hearing. *In re Petition of City of Overland Park for Annexation of Land*, 241 Kan. 365, 370, 736 P.2d 923 (1987). However, we have also held that "[t]he right to the cross-examination of witnesses in quasi-judicial or adjudicatory proceedings is one of fundamental importance and is generally, if not universally, recognized as an important requirement of due process." *Adams v. Marshall*, 212 Kan. at 599-600. See *Wulfkuhle v. Kansas Dept. of Revenue*, 234 Kan. 241, 246, 671 P.2d 547 (1983) (holding that the right to cross-examine witnesses testifying at administrative hearings of a "quasi-judicial" character is an important requirement of due process).

Mobil argues that simply because information concerning incremental reserves discovered by infill drilling may be confidential does not excuse a violation of due process when such information is vital to the resolution of an important issue in the case. In support

of its contention that the KCC violated due process, Mobil cites *City of Fairbanks v. Alaska P.U.C.*, 611 P.2d 493 (Alaska 1980).

In *City of Fairbanks*, the city appealed an order of the Alaska Public Utilities Commission denying the city a certificate of convenience and necessity to provide telephone service to a nearby military base and awarding a certificate to another company, Wirecom. The Public Utilities Commission had ordered Wirecom to provide 2 years of annual balance sheets and income statements so that it could assess Wirecom's financial stability. Wirecom agreed to provide such statements on the condition that they not be divulged to Fairbanks or become part of the record. The Commission agreed. Fairbanks argued that such an in-camera examination amounted to a denial of its due process right to cross-examination.

The Alaska Supreme Court agreed with Fairbanks, noting:

"In this case, Fairbanks had no way of knowing what the financial information consisted of, no opportunity to subject it to the tests of cross-examination or other means of verification, no opportunity to rebut it, and no opportunity to argue that the staff's conclusion did not logically follow from the information on which it was based. Likewise, neither this court nor the superior court can evaluate the Commission's conclusion without the underlying information. These fundamental defects amount to a failure of due process." 611 P.2d at 495.

The court further noted that the information was confidential and that its disclosure was subject to a statute prohibiting the disclosure of confidential information except in certain circumstances. However, the court noted that "[t]he privilege reflected by this statute should be construed narrowly so that it does not conflict with the constitutional requirements of due process. . . . If a conflict nevertheless occurs, due process must control." 611 P.2d at 497.

In reaching its decision, *City of Fairbanks* cited the United States Supreme Court's decision in *Ohio Bell Tel. Co. v. Comm'n*, 301 U.S. 292, 81 L. Ed. 1093, 57 S. Ct. 724 (1937). In *Ohio Bell Tel. Co.*, the Ohio public utilities commission relied on evidence not in the record to evaluate the property of a telephone company for rate-making purposes. The company argued that because it could not cross-examine or rebut the data, it was deprived of its right to a fair hearing. 301 U.S. at 298. In finding an infringement of the company's due process rights, the Court stated:

"From the standpoint of due process-the protection of the individual against arbitrary action—a deeper vice is this, that even now we do not know the particular or essential facts of which the Commission took judicial notice and on which it rested its conclusion. Not only are the facts unknown; there is no way to find them out. When price lists or trade journals or even government reports are put in evidence upon a trial, the party against whom they are offered may see the evidence or hear it and parry its effect. . . . The Commission, withholding from the record the evidential facts that it has gathered here and there, contents itself with saying that in gathering them it went to journals and tax lists, as if a judge were to tell us, 'I looked at the statistics in the Library of Congress and they teach thus and so.' This will never do if hearings and appeals are to be more than empty forms." 301 U.S. at 302-03.

Mobil's reliance on *City of Fairbanks and Ohio Bell Tel. Co.* is misplaced. In both of those cases, unlike our case, the evidence not subject to cross-examination was considered and relied upon by the respective commissions in making their decisions. In this case, the evidence which the KCC asked to receive in camera was never provided or considered by the KCC in reaching its decision. Instead, the KCC made its decision on the basis of information already on the record which had been subject to cross-examination. This is not a case, as in both *City of Fairbanks* and *Ohio Bell Tel. Co.*, where review is precluded because the KCC relied upon some information not in evidence to make its decision.

There still exists Mobil's contention that the KCC relied on the statements made by Candella and Montgomery concerning new reserves, even though Mobil was denied an opportunity to cross-examine either Candella or Montgomery on the basis for these statements. However, as the KCC's order makes clear, the KCC did not rely on either of these statements in making its decision regarding the acreage factor.

In its order concerning the acreage factor, the KCC provided a list of the testimony it relied on in making its decision. While the KCC relied on certain portions of Candella's testimony concerning infill wells, most notably the effect of the acreage factor on the drilling of infill wells and the capacity of the wells to produce, it did not rely on any statement of Candella concerning whether infill drilling leads to the discovery of incremental reserves. The same is true of the testimony of Montgomery. The KCC relied on Mont-

gomery's testimony concerning the use of infill wells as backup wells in case the original well suffered a casing failure and also relied on Montgomery's testimony concerning well pressure as the Hugoton Field is depleted. However, the KCC did not rely on any of Montgomery's statements concerning new reserves.

Instead, the KCC relied primarily on the testimony of Dr. Jerry Vairogs, reservoir engineering consultant for OXY, who stated that infill drilling allows for the recovery of additional reserves, as well as the testimony of Sam A. Giovinco, area engineering supervisor for Mesa. There is no allegation that Mobil was denied cross-examination of these two witnesses.

The reason the KCC chose not to rely on statements made by Candella and Montgomery on the issue of whether incremental reserves are being added becomes clear when their testimony is examined. Candella's testimony, for the most part, concerned the difference between Kansas production as compared with production in Oklahoma and Texas, and the negative results of that production on the Hugoton Field. Nowhere in his direct testimony did Candella mention increased incremental reserves from infill drilling. That issue was brought up by Mobil's counsel in cross-examination, and it is from this cross-examination that Mobil claims it was unduly restricted.

The same is true regarding Anadarko's witness, Todd Montgomery. The record shows that Montgomery's testimony concerning infill wells did not focus on incremental reserves but rather on the need to use infill wells to extract the identifiable reserves. Montgomery testified that infill drilling was necessary because original wells could experience casing failure and the economics of drilling of new wells after a casing failure declined with the age and pressure of the well. He was concerned that if infill wells are not drilled, gas that would be recoverable will be left below the surface because it will not be economical to extract it. The estimated increase in incremental reserves was an issue presented to Montgomery on cross-examination by Mobil's counsel. Further, Anadarko's published information concerning increased reserves was later subject to cross-examination by Amoco, and the same information sought by Mobil was elicited.

As can be seen, even though the KCC did restrict the cross-examination of both Candella and Montgomery as to the effect of infill drilling on incremental reserves, the record demonstrates that the KCC did not consider the testimony of Candella and Montgomery on that issue. The KCC refused to consider in-camera information that had not been subject to cross-examination. Consequently, there was no deprivation of Mobil's due process rights. Instead, the amendment was based only upon evidence which had been subject to cross-examination.

## III. LIMITATION OF A WELL'S ALLOWABLE TO ITS DEMONSTRATED CAPACITY TO PRODUCE

The KCC also amended the BPO by providing that a well would not be assigned an allowable in excess of its capacity to produce it, as determined by an average of the 3 highest production months in the preceding 12 months. Amoco argues that this 3-month average for allowables is discriminatory in that it takes allowables from wells that need them and allocates the taken allowables to overproduced wells. As a result, the overproduced wells do not then produce the amount of gas underlying their leases but, instead, take gas from other leases. More specifically, Amoco argues: (1) The KCC has violated K.S.A. 55-703; (2) the amendment lacks any evidentiary support for its conclusion that assignment of allowables in excess of the "three month average" encourages "waste"; and (3) the "three month average" provision violates K.S.A. 55-703, which the Commission is duty bound to follow.

### (a) Background

In order to fully understand Amoco's arguments, it is important to consider the assignment of allowables as it existed before and after the 1994 amendment. Because a well's pressure falls when it is produced, a production quota known as an allowable is given to each well in the field. The allowable for each well is based on a deliverability formula. Deliverability for each well is determined by having the well produce gas into the pipeline for 72 hours. During this time, the working pressure at the wellhead is to be maintained at 70% of the average shut-in wellhead pressure of the

field or as close to that pressure as operating conditions permit. The rate at which the well is producing at the end of the 72 hours is considered to be the stabilized producing rate. It is then adjusted to take into account the pressure of the well. The end product of this test is an estimation of the well's ability to produce gas at an average wellhead pressure, which is called the "deliverability" of the well. The allowable for the well is then calculated.

The first step in calculation is to determine the proration factor for the field by dividing the total market demand by the sum total deliverability of all the wells in the field multiplied by their acreage factors. The result is the field proration factor. The field proration factor is then multiplied by the individual well's deliverability times its acreage factor. The result is the well's allowable in cubic feet that may be produced during the period in question.

Under the terms of the BPO, if the well produces an amount above the allowable (overage) or below the allowable (underage), the amount is carried forward to the next proration period. Thus, wells that have been overproduced see their allowable cut for the next period, and wells that have been underproduced are allowed to make up that production, if they can, in the next period.

A well with a deliverability of greater than 300 million cubic feet (Mcf) is allowed to accumulate an overage equivalent to six times its current allowable in a given period. Thus, a well which produces more than its allowable in the period may do so but when the accumulated overage reaches an amount equal to six times its last allowable, it must be shut in. The well is not allowed to produce any gas until it has accumulated enough allowable that its overproduction is only five times the amount of its current allowable.

The wells which were underproduced in a given proration period had been allowed to accumulate an underage until it reaches an amount greater than six times the well's allowable. An underage in excess of this figure is canceled, although it may be reinstated later upon request of the operator if requested within a specific time.

## (b) The KCC's 1994 Amendment

The KCC amendment changed the above method for determining a well's allowable by providing:

"No well, except a well in over-produced status, shall be assigned a monthly allowable in excess of its demonstrated capability to produce defined as the average of the highest three months production in the last 12 preceding months. The implementation and the effective date of this amendment shall be referred to a study group consisting of industry and Commission staff with a final report to the Commission due on or before June 1, 1994."

## (c) OXY's Proposal For Change

The change in the BPO about which Amoco complains came about as the result of OXY's proposal for modification. In its application for change, OXY stated that the proration order in the BPO was not fulfilling its statutory mandates. Among the proposals made by OXY was that no well, except those in overproduced status, should be assigned an allowable greater than its demonstrated capability to produce. OXY defined a well's ability to produce to be the largest volume of gas produced in any of the preceding 12 months. Thus, according to OXY's proposal, if a well, which under the proration formula was entitled to a certain amount of allowable, had not produced at least that much in at least one of the months preceding the proration period, it would receive an allowable equal only to the greatest amount it had produced in the preceding 12 months rather than receiving the greater allowable, which might be beyond its capability to produce.

## (d) Hearing Evidence

There was a considerable amount of testimony for and against the proposal to limit the monthly allowable to its demonstrated capability to produce. Sam Giovinco, for Mesa, testified that the current proration formula was not distributing allowable equitably within the field. Giovinco stated that under the current rules, some operators are forced to shut in their wells because they produce their allowable too quickly and are forced to endure periods without production. This overproduction occurs because under pre-1994 amendments, allowables were assigned to wells that were not capable of producing the gas.

Gregory J. Natyzak, testifying on behalf of OXY, stated that 11% of the total allowable of the field is being assigned to wells that cannot produce it. Natyzak stated that this assignment serves no

purpose as the underage is simply increased and market demand goes unsatisfied. These slower-producing wells can never produce their allowables each period, with the result that the underage is not produced and eventually is canceled. Even if the wells apply to have the underage reinstated after it is canceled, many wells have accumulated underage greater than their reserves so that the underage can never be produced. According to Natyzak, assigning allowables only to wells which have the capacity to produce them will allow market demand to be met as well as provide an incentive for leases to produce their assigned allowable to protect their correlative rights.

Dr. Jerry Vairogs also testified on behalf of OXY's proposal to limit allowable to capacity. Dr. Vairogs testified that such a step was necessary because much of the existing underage accrued by wells in the Hugoton Field is beyond their production capacity.

Joseph D. Candella, of Vastar, testified that under the pre-1994 amendment, allowables are taken away from wells with better reservoir quality and production capabilities and given to the slower-producing wells in order to equalize production. However, according to Candella, the current underage in the Hugoton Field is simply not producible in a reasonable amount of time.

K. Todd Montgomery, of Anadarko, testified in favor of limiting production to capacity. He stated that the pre-1994 amendment system fails at meeting market demand because it shifts allowables to wells which cannot produce them, causing those wells to accumulate underage which they have no hope of ever producing.

Ronald L. Cook, a consultant to the KCC, testified on behalf of the KCC. He testified that the KCC consulting staff was opposed to OXY's proposal defining a well's capability as the highest month's production in the preceding 12 months. Cook stated that this was not a true measure of the well's ability to produce and instead favored a "three month average" in which the well's capability was defined as an average of its 3 highest months' production in the preceding 12 months. According to Cook, capacity to produce is generally related to the amount of reserves in a well. Those wells with a large volume of reserves generally have a higher capacity to produce than wells with less reserves.

Don Ray George, of Don Ray George and Associates, testified in favor of OXY's proposal. In his opinion, the definition of capacity which takes into account the 3 highest months of production overstates the capability of a well to produce on a sustained basis. However, George opined that some overstatement of capacity was necessary in order to give wells every opportunity to produce their allowable. George stated that while OXY's plan would have the effect of generally reducing the allowable to wells located on the flanks of the Hugoton Field, these were wells that were having underage canceled under the current plan.

Gregory P. Womack, from Amoco, testified against the plan. Womack testified that he felt it was error to assign allowables based only on the capability of wells to produce rather than on the amount of gas underlying the unit. Womack also stated that it was inappropriate to limit a well's allowable assignment to an arbitrarily defined capacity number because capacity can be modified, depending upon the level of control an individual operator has over its gas reserves and surface facilities.

The KCC concluded that there was no reason to assign allowables to wells that could not produce them. According to the KCC, doing so would simply prevent market demand from being met and encourage waste. As a result, the KCC amended the BPO to provide that no well except one in an overproduced status should be assigned a monthly allowable in excess of its capability. Capability was defined as the average of the 3 highest months of production over the preceding 12 months.

(e) Amoco's Arguments

(1) Violation of K.S.A. 55-703

Amoco's first contention is that the KCC's decision violates K.S.A. 55-703 because it considers factors which are extrinsic to the common source of supply in determining capacity. According to Amoco, the KCC may only consider factors which exist in the common source of supply when it is promulgating rules and regulations regarding proration of the Hugoton Field.

K.S.A. 55-703(a) provides in part that the KCC

"shall regulate the taking of natural gas from any and all common sources of supply within this state in order to prevent the inequitable or unfair taking of natural gas . . . and to prevent unreasonable discrimination . . . in favor of or against any producer in any common source of supply. In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent."

Amoco reads K.S.A. 55-703(a) as requiring the KCC to use a proration system which assigns allowables in proportion to the reserves underlying the lease and argues that the 3-month average is greatly influenced, not by the amount of gas underlying the lease or other factors *intrinsic* to the Hugoton Field but, rather, factors that are *extrinsic* to the Hugoton Field. The essence of Amoco's argument is that while the proration system assigns allowables based upon the ability of wells to produce at a common pressure, thus equitably distributing allowables, the limitation of allowables to the demonstrated 3-month average brings in many factors that have nothing to do with the amount of gas underlying the reservoir, *viz.*, the operating pressure of the wells gathering lines, the capacity of those lines, differing markets for natural gas between operators, and mechanical problems.

The district court determined that K.S.A. 55-703(a) does not operate in a vacuum but instead must be read in conjunction with K.S.A. 55-704, which authorizes consideration of extrinsic factors by providing that the KCC may

"promulgate such rules and regulations as may be necessary for the prevention of waste as defined by this act, the protection of all water, oil or gas-bearing strata encountered in any well drilled in such common source of supply, ascertaining the several factors entering into the determination of the productive capacity of each well, the total productive capacity of all wells in the common source of supply, the establishment of such other standard or standards as the commission may find proper to determine the productive capacity of each well and of all wells in such common source of supply, and as the commission may find necessary and proper to carry out the spirit and purpose of this act . . . ."

K.S.A. 55-704 provides the KCC with the authority to set standards for determining the productive capacity of individual wells within the Hugoton Field and other rules and standards necessary

and proper to carry out the purpose of the Gas Conservation Act. As previously stated, the KCC's duty under the Act is to prevent waste and protect correlative rights. *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n*, 237 Kan. 248, 254, 699 P.2d 1002 (1985). The KCC must also allow sufficient production to meet the market demand if such can be done without waste. *Colorado Interstate Gas Co. v. State Corporation Comm.*, 192 Kan. 1, 24, 386 P.2d 266 (1963).

While K.S.A. 55-703(a) provides a list of factors existing in the source of supply which shall be considered by the KCC in determining each well's productive capacity, the KCC is vested with wide authority under K.S.A. 55-704 to set rules and standards in order to determine the productive capacity of wells in the field. Nothing in K.S.A. 55-703(a) provides that the list of factors contained therein is exclusive; rather, K.S.A. 55-703(a) provides that such factors intrinsic to the common source of supply shall be considered.

The 1994 amendment gives equitable consideration to those pertinent factors listed in K.S.A. 55-703(a) in that each well is assigned an allowable based on its performance in a shut-in production test against a common operating pressure. The 1994 amendment changed the formula by providing that the allowables calculated through the use of the above test is limited to the demonstrated capacity of the well to produce during a certain period of its 3-month average.

Amoco argues that the KCC cannot rely on the broad authority granted by K.S.A. 55-704 because it explicitly states that any standards set by the KCC must be within the "spirit and purpose" of the Act. Amoco asserts that the spirit and purpose of the Act as set forth in K.S.A. 55-703(a) is the protection of correlative rights in order to allow each lease to ultimately produce the amount of gas underlying it. However, while the protection of correlative rights is indeed one of the purposes of the Act, there are also two other purposes which must be considered: the prevention of waste and market demand. See *Colorado Interstate Gas Co.*, 192 Kan. at 24. All of three purposes must be considered by the KCC in promulgating standards for the Hugoton Field.

K.S.A. 55-704 confers upon the KCC broad powers to set standards for determining the productive capacity of each well in the field in order to accomplish the three purposes of preventing waste, protecting correlative rights, and satisfying market demand. We conclude that the actual demonstrated producing ability of each well is a factor that may be considered by the KCC and its consideration is within the statutory authorization of the Act.

(2) Evidentiary Basis for Amendment

Amoco contends that the limitation of an allowable to a well's demonstrated capacity to produce under the 3-month average is not supported by the evidence in that the evidence fails to establish that such a limitation prevents waste, meets market demand, and protects correlative rights. Amoco argues that the KCC amendment does not further any of these objectives.

Contrary to the arguments of Amoco, there is substantial competent evidence in the record to support a conclusion that the pre-1994 amendment system of allocating allowables encourages waste. Dr. Jerry Vairogs, of OXY, testified that wells in the Hugoton Field were receiving allowables so far in excess of capacity that they could not ever produce their underage. Joseph D. Candella, of Vastar, testified that the current underage in the Hugoton Field is simply not producible in a reasonable amount of time. K. Todd Montgomery, of Anadarko, also testified that the old system of distributing allowables caused wells to accrue more underage than they could ever hope to produce. Gregory J. Natyzak, of OXY, stated that this assignment of underage to wells that cannot produce it serves no purpose, as underage is simply increased and market demand goes unsatisfied. According to Natyzak, many wells can never produce their allowables each period, resulting in the cancellation of underage. He concludes that the accumulation of underage has become such a serious problem because many wells have accumulated underage greater than their reserves.

There is also substantial competent evidence in the record to support a conclusion that the pre-1994 amendment system had an adverse impact on market demand. While Amoco argues that between 1988 and 1991, the Hugoton Field produced between 99%

and 100% of market demand, Sam Giovinco, of Mesa, testified that market demand was being met only because other wells in the field were overproducing. Joseph D. Candella and K. Todd Montgomery also testified that assigning allowables to wells that do not produce them causes difficulty in meeting market demand.

Amoco argues that the accumulation of underage does not encourage waste because gas that is not produced simply stays in the ground until it is produced. This argument ignores evidence which suggests that many wells are accumulating underage that will never be produced because the wells are unable to produce their monthly allowables. Moreover, there is evidence that many wells have accumulated underage greater than the reserves remaining underneath their leases. Instead, the continued assignment of allowables to wells which cannot produce them forces other wells to overproduce to meet market demand which subjects those wells to being shut in because they have used up their allowables. There is substantial competent evidence to support the conclusion that the assigning of allowables to wells that cannot produce them encourages waste and has a negative effect on the Hugoton Field's ability to meet market demand.

Finally, Amoco argues that the restriction of allowables to capacity violates correlative rights because it takes that portion of the well's allowable that would normally be underage and "respreads" it to other wells, thereby allowing them to ultimately produce more then their fair share of gas. Amoco further argues that by not allowing the well a chance to make up some of the allowable in excess of capacity as underage, correlative rights and the purpose of K.S.A. 55-703(a) are violated.

According to Amoco, if a well is limited to its capacity to produce by the 3-month average, it will not receive its fair share of allowables. Under the usual proration system, market demand is spread among the wells in the form of allowables. If a well does not produce its allowable, another well's allowable does not increase; instead, the well is allowed to carry that part of the allowable forward as underage and produce it at a later date. However, if a well's allowable is limited to its demonstrated capacity to produce, the well will not receive the share of allowable that is indicated by its

deliverability factor. Instead, that allowable will go to other wells and will be in excess of the allowables they receive based on their deliverability factors.

Amoco argues, by way of illustration, that if market demand is 250 Mcf and there are two wells in the field, the wells receive their allowables based on their deliverability factors, which indicate the ability of wells to produce against a common pressure. If Well A and Well B both have the same deliverability factor, each will receive 125 Mcf as its allowable. If allowables are limited to capacity and, due to problems with the pipeline or other influences such as gathering line pressure, Well B has historically only been able to produce 100 Mcf, then Well B will be limited to an allowable of 100 Mcf and Well A will receive an allowable of 150 Mcf. Without a system of limiting allowables to capacity, both wells would receive 125 Mcf, and Well B would produce 100 Mcf and carry the remaining 25 Mcf as underage, which it would be allowed to make up in the future. Under this scenario, Well A would probably still produce 150 Mcf in order to satisfy market demand and would be assessed 25 Mcf in overage, which it would have to carry forward.

According to Amoco, the problem with the limitation of allowable to capacity, as illustrated by the above example, is that Well B is never allowed to make up the 25 Mcf and, instead, Well A receives a bonus of 25 Mcf. Over time, Well A will drain faster and eventually gas will migrate from Well B to Well A, causing a violation of correlative rights.

On its face, this example shows that the limitation of allowables to capacity will cause a violation of correlative rights. However, several other factors exist which blunt the effect of this limitation. First, there is evidence that demonstrated prior production, even under the 3-month average, actually overstates the well's ability to produce over time. Therefore, in many cases, even the allowable assigned using the 3-month average will be beyond the capacity of the well to produce. For those wells which simply experienced some mechanical or other difficulties in the preceding months resulting in a low 3-month average, it must be remembered that the average is a moving one. Because a well is allowed to produce a

number of times its actual allowable in any given period, the average will increase dramatically once the well begins producing.

In addition, because of earlier limitation, the wells' shut-in pressure will be higher, resulting in an increase in allowables under the proration formula. Thus, wells that were once limited in capacity as the result of mechanical or pipeline problems will have an advantage in the calculation of further allowables because of the difference in pipeline pressure. This will allow the wells to make up production lost and help equalize any draining that may occur.

The above factors serve to mitigate any damage to correlative rights as the result of limiting allowables to capacity. There is a question as to how far the KCC must go to maintain equity in the Hugoton Field. K.S.A. 55-703 requires the KCC to regulate the inequitable or unfair taking of natural gas from the common source of supply in order to permit each developed lease to ultimately produce approximately the amount of gas underlying it without uncompensated cognizable draining. This court has found that the KCC's duty under K.S.A. 55-703 is fulfilled when each owner is legally free to produce and is not denied the right or opportunity to produce his or her allowables. In *Colorado Interstate Gas Co.*, 192 Kan. at 25, we stated:

"The Commission could not be required to shut in an entire gas field to protect correlative rights where some of the producers desired to cease production and hold a gas field for a reserve. The Commission could not be required to unduly restrict production in a gas field because some producers desired to deplete the gas as a very low rate regardless of the reason."

The situation is the same in this case. The record indicates that many wells were being assigned allowables that they had no hope of producing, forcing other wells to overproduce in order to meet market demand. Those wells were then subject to being shut in and not allowed to produce until the wells producing at a slower rate could catch up. The reason for the slower rate of production was not that the gas under the wells could not be produced at a faster rate. Had that been the case, excess allowables would not have been assigned to them in the first place under the proration system. Instead, underage is accumulated due to such factors as contract disputes, loss of market, well mechanical problems, or

high gathering line pressures. These are not factors within the control of the KCC and the KCC is not obliged to curtail production with resulting waste and unmet market demands based solely on the operator's production problems.

Amoco argues that the need to meet market demand cannot override the protection of correlative rights because K.S.A. 55-703(a) requires assignment of allowables that permit each operator to ultimately produce the amount of gas underlying the operator's lease. However, in *Colorado Interstate Gas Co.*, 192 Kan. at 24-25, we said:

"In a gas field such as the Kansas-Hugoton . . . , the responsibilities placed upon the Commission will clash. If the market demand cannot be supplied without waste, or if correlative rights cannot be protected without waste, or if correlative rights cannot be protected without unduly restricting production needed for market demand, one of the three, waste, market demand, or correlative rights, must suffer. . . .

. . . .

"When waste, market demand, and correlative rights are in conflict the Commission must determine which is to be given preference. If the decision of the Commission is supported by the evidence, the courts cannot interfere."

The evidence of record supports a conclusion that the 1994 amendment prevents waste and increases the ability to satisfy market demand even though the limitation may cause minimal damage to correlative rights. Under these circumstances, this court should not interfere with the KCC's determination.

### (3) K.S.A. 55-703 and K.A.R. 82-3-101(a)(17)

Finally, Amoco argues that the 3-month average provision violates K.S.A. 55-703 and K.A.R. 82-3-101(a)(17) because when allowables are respread from the underproduced well, the overproduced well and other wells receive an allowable that will permit recovery of more gas than that which underlies their leases by draining gas from the underproduced lease. Amoco also contends that the KCC violated its own rules in adopting this provision in that it failed to give proper notice to the parties, denying them of an opportunity to present evidence on the subject of respreading of allowables.

Under K.S.A. 77-621(c)(5), a district court is authorized to grant relief when the administrative agency has engaged in an unlawful procedure or has failed to follow prescribed procedure. Amoco contends that the KCC, in adopting the 3-month average, failed to follow its own prescribed procedures, specifically those contained in K.A.R. 82-1-230(c) and K.A.R. 82-1-232(a)(3). K.A.R. 82-1-230(c) concerns procedure at hearings and provides that each witness shall be examined and cross-examined under oath. K.A.R. 82-1-232(a)(3) concerns orders of the KCC and states that an order shall contain, among other things, a concise and specific statement of the relevant law and basic facts which persuade the KCC in arriving at its decision.

Amoco is concerned with the "respreading provision" of the KCC's order limiting allowables to capacity. Amoco had ample opportunity to cross-examine witnesses on the general issue of limiting allowables to capacity, as this was one of the principal tenants of OXY's proposal. Likewise, the KCC clearly stated the relevant law and facts that persuaded it to adopt OXY's proposal with only a slight change in calculating the production capacity for each well. It appears, although it is by no means clear, that Amoco is complaining about the KCC's method of instituting the 3-month average. In deciding to restrict allowables to capacity, the KCC stated:

"The Commission accordingly finds that the three-month average definition proposed by staff to be reasonable and a reliable measure for determining the well's capacity and for calculating allowables. The means, however, to achieve this decision warrants further study. The Commission shall therefore refer this matter to a study group comprised of industry and Commission staff. This study group shall then deliver to the Commission on or before June 1, 1994, its recommendation."

On May 26, 1994, the KCC issued a supplemental order adopting the recommendation of the staff as to the formula to calculate allowables.

Amoco alleges that what it terms to be the "respreading provision" was implemented by the study group following this decision. However, it is clear that the study group simply provided a mechanism by which the order of the KCC could be carried out. The

method for calculating allowables is simply the use of the 3-month average that was the subject of debate before the KCC. The study group's proposal simply implemented the decision of the KCC on the matter. Thus, no new hearings were required.

Amoco asserts that the so-called "respreading provision" is a new idea that was put in at the last minute. However, the record does not support such a conclusion. Amoco's use of the term "respreading provision" is misleading. Under the formula adopted by the KCC, a well's allowable is limited to its capacity. Any remaining market demand is assigned in the form of allowables to other wells in the field. This was the same method that was heavily debated at the original hearings. In fact, the KCC's consultant, Ronald L. Cook, was cross-examined on the exact subject of what Amoco now terms the "respreading provision."

The record demonstrates that the KCC did not enact any part of the provision limiting allowables to capacity without a full hearing, cross-examination, and an explanation of the law and facts supporting its decision.

## IV. EXPANSION OF THE TIME TO PRODUCE EXISTING UNDERAGE

Both OXY and Vastar appeal that part of the KCC's order which provides for a 10-year period in which all canceled and reinstated underage must be produced before being permanently canceled. OXY argues that the extension was adopted without notice or an opportunity to be heard. Additionally, OXY and Vastar argue that the KCC's order arbitrarily extends the period in which canceled and reinstated underage may be produced.

### (a) Background

In order to resolve this issue, it is necessary to review some of the procedural history relating to the cancellation of underage in the Hugoton Field. Prior to the amendment complained of by OXY and Vastar, any well with an adjusted deliverability in excess of 300 Mcf was allowed to accumulate underproduction, or underage, up to six times its current allowable. Any underage in excess of this figure was canceled. Once underage was canceled, the well oper-

ator had 3 years from the date of cancellation to apply for reinstatement and thereinafter, a period of 5 years in which to produce the underage.

Part of OXY's proposed amendment to the BPO was a proposal that all canceled underage either reinstated or eligible for reinstatement at the time of the order be reinstated and produced by December 31, 1994, or be permanently canceled. OXY also proposed that any underage canceled after the date of the order should be permanently canceled and reassigned to overproduced wells in addition to their allowable the next month.

## (b) Hearing Evidence

There was a substantial amount of testimony regarding the cancellation of underage. Gregory J. Natyzak, of OXY, testified that the current system of working off underage is not efficient and that the system should be modified so that future underage is minimized. If underage is not cleaned up, it will continue to distort the perceptions and workings of proration in the Kansas Hugoton Field. He noted that prior modifications have been added to the proration order to give operators more time to produce underage, yet underage continues to grow. Natyzak was in favor of OXY's proposal that all existing underage be subject to cancellation in 1994.

Sam Giovinco, of Mesa, also testified in favor of OXY's proposal. He stated that an incentive is necessary to encourage operators to produce their allowables. He felt that operators who do not produce their allowables should suffer some cancellation.

Gregory Womack of Amoco, however, felt that OXY's proposal regarding underage removes needed flexibility from the system and fails to recognize the differences between individual operators and the amount of control those operators have over their reserves. Womack testified that a majority of the underage in the field is in fact producible and has value, especially if infill wells are allowed to work off the parent well's underage.

According to Womack, the production of underage provides an incentive to make investments. He stated that if Amoco could gain control of its facilities and makes some necessary upgrades, it would

be able to work off its accumulated underage in 6.14 years, assuming a market demand of 400 Bcf per year. A lower market demand would allow it to work off its underage even sooner. Under cross-examination, Womack admitted that if Amoco cannot make the changes, it would take Amoco 9.6 years to work off its underage under a best-case scenario. Womack stated that, in order to protect correlative rights, underage should never be canceled because it represents an allowable based on the reserves underlying the well.

Lester Wilkonson, an independent petroleum consultant, testified that the ability to accumulate underage is not an impediment to the protection of correlative rights but instead enhances an operator's capability to protect such rights. In his opinion, underage should never be canceled in the first place because it represents gas under the lease. He also stated that the present system is ineffective because it allows underage to be canceled, reinstated, recanceled, and then re-reinstated, with the effect that most cancellation simply occurs on paper.

Ronald L. Cook, of the KCC staff, also testified in opposition to OXY's proposal. Cook stated that canceled underage may be viewed as an opportunity to produce gas that might possibly be recovered within a certain time period if the operator chooses to improve the well's capability. According to Cook, the KCC staff felt that OXY's proposal to cancel underage provides too short a time period for operators to make up their current underage plus the reinstated underage. Instead, the staff proposed that reinstated underage be made up by December 31, 1997, or be permanently canceled. The staff further proposed that any underage canceled during any calendar year be made up by the end of the next calendar year or be permanently canceled. Cook stated that there needs to be a time in which canceled and reinstated underage should be canceled permanently.

Ken Milburn, of Williams Natural Gas Company, testified that permanent cancellation of underage leads to harsh and unfair results because underage serves as an incentive to drill infill wells. In his opinion, producers should be provided an adequate time to make up underage.

## c) The KCC's Decision

The KCC determined that adopting OXY's proposal would adversely affect the rights of operators who relied on the current provisions of the BPO. The KCC also found that allowing wells an opportunity to produce their existing underage was important to the state of the Hugoton Field and that producers needed a reasonable time to produce existing underage. Accordingly, the KCC rejected both OXY's proposal and that of its own staff by implementing a 10-year time period within which all existing underage would have to be produced. This 10-year period was made subject to KCC oversight, and the KCC reserved the right to hold hearings on whether this period should be extended or reduced, depending upon the situation. However, the KCC also adopted its staff's proposal for underage canceled after December 31, 1993. Under the KCC's order, operators accumulating underage after that date would have 1 calendar year following the year in which the underage is accrued to produce that underage or see it permanently canceled.

## (d) Arguments of the Parties

### (1) Notice of Hearing

OXY's initial argument is that the KCC erroneously extended the time in which to produce underage without proper notice and a chance for a hearing. OXY argues that because no party had requested that the KCC lengthen the time period in which to produce underage, that proposal was not before the KCC. According to OXY, the KCC violated concepts of fundamental fairness in adopting the 1994 amendment.

This argument was first brought to the KCC's attention in OXY's petition for reconsideration. In response to this argument, the KCC stated:

"The objecting parties are correct that no notice was given specifically addressing the 10-year extension. Notice was given, however, in connection with OXY's application that the underage issue and paragraph (p) of the Order would be addressed by the Commission. The Commission does not believe that specific notice was required and that the notice given by OXY in connection with its

application was sufficient notice for the Commission to amend paragraph (p) of the Basic Proration Order."

The district court affirmed the KCC's denial of OXY's petition for reconsideration on this issue, stating:

"In its 'Notice of Hearing' the KCC did disclose that a proposed amendment for '[changing] the dates for reinstatement and production of existing canceled underage and reinstated underage' would be heard. This notice should have been a clear indicator to any interested party that the KCC might consider either lengthening or shortening the time to produce canceled and reinstated underage. . . .

"Clearly questions concerning pre-1994 underage could be expected to be addressed by the KCC when the Commission gave notice that it would consider 'changing the dates for reinstatement and production of existing canceled underage and reinstated underage.' Given the fact that OXY proposed that the time period for permanently canceling pre-1994 underage should be shortened, while the KCC Staff proposed to lengthen the time period and other parties argued for no permanent cancellation of underage, it is evident that the parties involved understood the significance of the notice. Though the KCC may never have specifically stated that it would consider establishing a ten (10) year deadline for production of such underage, sufficient notice was given to OXY and the other interested parties that the permanent cancellation date for the underage would be under review and subject to possible change. Thus OXY's contention, that they were provided insufficient notice of the change made by the KCC to paragraph (p) of the Kansas Hugoton BPO, is not persuasive."

K.S.A. 55-706(a) provides that the KCC may institute proceedings upon petition of any interested party, upon petition of the attorney general on behalf of the State, or on its own motion. These proceedings are to be commenced in the manner provided by K.S.A. 55-605 and amendments thereto. K.S.A. 55-605(a) requires the KCC to give reasonable notice to interested parties and that such notice should contain such information as will briefly and adequately disclose the matter to be considered or the relief sought.

The notice relied upon by the KCC and the district court was actually issued by OXY in conjunction with its application to amend the BPO. However, it is not a part of the record on appeal. A copy is included in the appendix of Amoco's appellee's brief. It states, among other things, that OXY is requesting a change in the dates for reinstatement and production of existing canceled underage and reinstated underage.

Even disregarding the notice given, however, it was apparent from OXY's application that the time for reinstatement and production of underage was at issue. Although OXY proposed to shorten the time period for the production of canceling underage, its proposal was not the only one on the table. The KCC staff countered with a proposal of its own to lengthen the time for producing canceled underage while shortening the time to produce underage in the future. Both of these proposals, as well as the testimony of several witnesses that underage should not be canceled at all, were subject to cross-examination. Under these circumstances, although no notice was given that a 10-year time period in which to produce underage was at issue, the issue of the time for producing canceled underage was sufficiently developed to allow the KCC to amend the BPO to extend the time to produce underage if such an amendment is supported by the evidence. Therefore, OXY's initial argument, that the extension of time to produce canceled underage was adopted without notice, fails.

(2) Lack of Evidentiary Support

OXY and Vastar also argue that the extension of time to produce underage is not supported by the evidence. They contend that there was no evidence tending to support the adoption of a 10-year time period for the production of underage and that such period is contrary to evidence and the remaining provisions of the KCC order.

It is true that no evidence was presented specifically advocating a 10-year time period for the production of pre-1994 underage. Nevertheless, there was evidence in the record that OXY's proposal was too harsh and would damage correlative rights. There was also evidence that the production of underage was essential to the protection of correlative rights and that if the underage proposal was amended, a reasonable time was needed to permit those producers relying on the present BPO a chance to increase production and produce their accumulated underage.

Based upon this evidence, the KCC determined that it should adopt the proposal of its staff and require any new underage to be made up within the next calendar year. Along with this determi-

nation, the KCC decided that, in order to be fair to producers who were relying on the BPO's current application of underage rules, the KCC needed to give producers a reasonable time in which to make up their underage. Each of these determinations is supported by substantial competent evidence.

The question thus becomes whether substantial evidence supports the 10-year period of time to produce canceled underage. According to OXY and Vastar, the adoption of the 10-year period was arbitrary and capricious because no proposal specifically argued for such a period. There is, however, evidence which supports the KCC's determination.

The BPO, as it existed prior to amendment, provided a period of 3 years to reinstate underage and 5 years after to produce it, for a total of 8 years. However, testimony showed that very little underage was being permanently canceled because the rules allowed for underage to be canceled, reinstated, recanceled, and then re-reinstated. OXY's proposal was that all canceled underage either reinstated or eligible for reinstatement at the time of the order be reinstated and produced by December 31, 1994, or be permanently canceled. The KCC staff proposed that reinstated underage be made up by December 31, 1997, or be permanently canceled. There was also evidence, however, that other proposals adopted by the KCC, such as an incentive for infill drilling and the ability of both the infill and the original well to work off the underage of the lease, would make more of the underage in the field ultimately producible. According to Amoco's expert witness, if Amoco could make necessary improvements to its facilities, it could work off its accumulated underage in 6.14 years or sooner, depending on market demand. However, this ability was dependent on Amoco gaining control of its production facilities, which could take some time. Without such changes, Amoco would take approximately 9.6 years to work off its underage.

In addition to testimony that allowing producers time to produce underage was vital to the protection of correlative rights, the KCC heard some testimony indicating that underage should never be permanently canceled. Both Gregory Womack and Lester Wilkon-

son testified that because underage actually represents gas reserves underlying the lease, it should never be subject to cancellation.

Under these circumstances, the KCC crafted a compromise after viewing the evidence as a whole. The KCC decided to create an incentive to drill infill wells and produce allowables in an orderly fashion. The KCC further decided to limit the production of new underage by restricting allowables to the demonstrated capacity of the wells to produce them and by providing for the cancellation of new underage after 1 year. However, the KCC also decided to give producers relying on the BPO every opportunity to protect their correlative rights by making investments in equipment and upgrading their production by providing them with a 10-year period in which to produce existing underage.

As we have stated above, our standard of review is that we may not set aside an order of the KCC merely because we might have reached a different conclusion if we had been the trier of fact. Only when the evidence shows that the KCC's determination is so wide of the mark as to be outside the realm of fair debate may we set aside the order. See *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 474, 749 P.2d 21 (1988). Although this court might not have reached the same conclusion when viewing the record as a whole, substantial competent evidence supports the KCC's decision concerning the 10-year period to produce underage. The KCC's decision is not so wide of the mark as to be outside the realm of fair debate.

## V. INTERVENTION

OXY argues that the KCC erred in allowing certain pipeline companies to intervene in this action. According to OXY, the pipeline companies have no rights at issue in this case, and the KCC's order allowing them to intervene was unreasonable, arbitrary, and capricious.

### (a) The KCC 's Decision

The action of which OXY complains occurred when several pipeline companies made motions to intervene. OXY objected to this intervention on the grounds that none of the pipeline companies

had correlative rights in the matter. The KCC found that pipeline companies had traditionally been permitted to participate in the KCC meetings and might be prejudiced if they had not been allowed to participate in this hearing. The KCC further found that it had the power to limit the pipelines' participation in order to prevent undue prejudice. Accordingly, the KCC granted the motions to intervene over OXY's objections. The KCC also denied OXY's petition for rehearing on this issue, finding that intervention of the pipelines was proper.

## (b) The District Court's Decision

The district court found that because the KCC was vested with wide discretion in allowing parties to intervene, and because OXY alleged no prejudice as a result of this intervention, the decision should not be overturned on review. We agree.

K.S.A. 77-521(b) allows the KCC discretion to grant a petition for intervention upon a determination that the intervention sought is in the interests of justice and will not impair the orderly and prompt conduct of the proceedings. While the evidence of record supporting the decision that intervention was in the best interests of justice is sparse, the intervention did not impair the orderly and prompt conduct of the proceedings. Further, OXY provides no evidence of prejudice other than its contention that intervention caused unnecessary delays. OXY does argue that allowing the intervention of the pipeline companies permitted those companies to inquire about matters which were not pertinent to the BPO and were of questionable relevance. However, OXY makes no attempt to show how these matters in any way affected any of the amendments to the BPO of which OXY now complains. Indeed, the intervention of the pipelines had no effect on any of the amendments adopted by the KCC. Thus, like the trial court, we conclude that there is no abuse of discretion established and further conclude

that no prejudice to any party has been established. See *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. at 475.

Affirmed.

ABBOTT and LARSON, JJ., not participating.

ROBERT H. MILLER, C.J., Retired, assigned.